S. H. BURRELL *et al.*, Appellants, v. S. L. HIGHLEYMAN, Respondent.

**St. Louis Court of Appeals, December 11, 1888.**

1. **Statute of Frauds:** SALE OF CHATTEL. When the subject-matter of a contract is a chattel to be afterwards delivered, then, although work and labor are to be done on such chattel before delivery, the cause of action is goods sold and delivered, and the contract is within the statute of frauds, section 2514, Revised Statutes.

2. **Statute of Frauds:** WORK AND LABOR ON CHATTEL SOLD. (*Per Thompson, J., dissenting*). The statute of frauds was imported into this state from England, and at the time of such importation the settled judicial interpretation thereof in England was that, where work, labor or materials were to be applied to the chattel in order to put it in condition for delivery to the purchaser, such a contract was not within the statute. It follows that the same law of interpretation prevails in Missouri.

Burrell v. Highleyman.

*Appeal from the St. Louis City Circuit Court.*—HON. SHEPARD BARCLAY, Judge.

AFFIRMED.

*Dyer, Lee & Ellis,* for the appellants.

The rule of law is tersely and clearly laid down in 3 Parsons on Contracts [ 7 Ed.] p. 54, as follows: "If the contract states or implies that the thing is to be made by the seller, and also blends together the price of the thing, and compensation for work, labor, skill and material, so that they cannot be discriminated, it is not a contract of purchase and sale, but a contract of hiring and service, or a bargain by which one party undertakes to labor in a certain way for the other party, who is thereupon to pay him certain compensation; and this contract is, therefore, not within the statute. And these rules will be found to reconcile most of the recent authoritative decisions on the subject." The three pieces of furniture, in their unfinished condition, were not articles of furniture then existing, and did not become such until completed in accordance with the respondent's instructions. They were manufactured especially for the respondent, and upon his special order, and not for the general market, and therefore, the contract for them was not within the statute of frauds. *Goddard v. Binney,* 115 Mass. 450; *Mead v. Case,* 33 Barb. 202; *Meincke v. Falke,* 55 Wis. 427; *Parker v. Schenck,* 28 Barb. 38; *Courtright v. Stewart,* 19 Barb. 455; *Eichelberger v. McCauley,* 5 Harr. & J. (Md.) 213; *Hight v. Ripley,* 19 Me. 137; *Cummins v. Dennett,* 26 Me. 397; *Abbott v. Gilchrist,* 38 Me. 280; *Edwards v. Railroad,* 48 Me. 379; *Crockett v. Scribner,* 64 Me. 447; *Allen v. Jarvis,* 20 Conn. 38; *Spencer v. Cone,* 1 Met. 283; *Crookshank v. Burrell,* 18 Johns. 58; *Parsons v. Loucks,* 48 N. Y. 17; *Deal v. Maxwell,*

Burrell v. Highleyman.

51 N. Y. 652; *Dowling v. McKenney*, 124 Mass. 478; *Downs v. Ross*, 23 Wend. 271, 272; *Higgins v. Murray*, 73 N. Y. 252; *Wharton v. Car & Foundry Co.*, 1 Mo. App. 577.

*H. S. Priest*, for the respondent.

Long after the statute of Geo. IV., interpreting in part the statute of frauds, and until the decision in *Lee v. Griffin*, 1 B. & S. 272, the construction of the statute of frauds in its application to a given case was in doubt. But that case is said to have settled the law in England, and has been followed by all of the states of the union which had not previously declared in favor of the early and narrow rule of the English courts. "When the subject-matter of the contract is a chattel to be afterwards delivered, then the cause of action is goods sold and delivered, and the seller cannot sue for work and labor." The rule of *Lee v. Griffin*, as we have before remarked, has been followed in all the states not bound by having adopted the earlier English rule. It is the rule in Minnesota, Wisconsin, Connecticut and New Hampshire. *Bunt v. Bailey*, 21 Minn. 402; *Hardell v. McClure*, 1. Pin. (Wis.); *Prescott v. Locke*, 51 N. H. 94; *Atwater v. Hough*, 29 Conn. 508; *Clark v. Nicholds*, 107 Mass. 547; *Moody v. Brown*, 34 Me. 107; *Clay v. Yates*, 1 H. & N. 73; *Delventhal v. Jones*, 53 Mo. 463; *Kirby v. Johnson*, 22 Mo. 354; *Smith v. Surman*, 9 B. & C. 568; *Atkinson v. Bell*, 10. B. & C. 279.

ROMBAUER, P. J., delivered the opinion of the court.

The question of law arising upon this appeal will sufficiently appear by the plaintiff's statement filed herein, a brief summary of the plaintiff's and defendant's evidence, and the declaration of law made by the court, it being conceded that the statute of frauds was interposed as a defense to the action.

The statement of the cause of action, filed before the justice, is as follows: "Plaintiffs state that at the time of the transactions hereinafter set forth, they were co-partners, trading under the name of Burrell, Comstock & Co., and for their cause of action herein plaintiffs say, that in or about the month of April, 1885, the defendant requested plaintiffs, who were then and there manufacturers and dealers in furniture, to manufacture for him the following furniture, to-wit: One mahogany parlor sofa, one mahogany easy chair, one mahogany small chair, and agreed to pay plaintiffs therefor the sum of two hundred (200) dollars, and that plaintiffs accepted said order. That immediately after said order was given to plaintiffs, they manufactured said furniture, as they had agreed to do, and then and there offered to deliver said furniture to the defendant, but the defendant then and there refused to accept or receive the same. Plaintiffs further say that, by reason of the failure and refusal of defendant to receive and pay for said furniture according to his contract, they have been damaged in the sum of one hundred (100) dollars, for which they claim judgment."

The plaintiffs, subject to the objection of the statute of frauds, gave evidence tending to show that they were manufacturers and dealers in furniture; that the defendant called at their place of business and ordered a parlor set, consisting of a sofa, an arm-chair, and ladies' chair, for two hundred dollars; that this furniture was complete at the time, with the exception of the covering and trimming; that it is kept in stock in that shape, for inspection, and covered and trimmed according to order of purchasers; that the defendant selected the covering and trimming, which was worth about one hundred dollars, or half the price of the finished furniture, and thereupon left. No memorandum of the transaction was made, nor was any earnest-money paid. The furniture was completed before the defendant

revoked his order.   The defendant refused to take the goods when completed.

The defendant gave evidence tending to show that he gave the order as stated by plaintiffs, with the proviso that, as he would not need the furniture for a couple of weeks, plaintiffs need not keep it for him, but should sell it if anybody else wanted it.   The same evening, or the next day, the defendant becoming dissatisfied with his bargain, wrote to plaintiffs that he would not take the furniture.

The court thereupon made the following declaration of law : "If the court finds, from the evidence, that the contract in question was intended by both parties as a sale of the goods in question, for a price of two hundred dollars, to be hereafter delivered, and that no earnest-money was paid and no part of the goods accepted, and the contract not in writing, then, under Revised Statutes, section 2514, invoked by the defendant herein, the finding must be for the defendant." And having thus declared the applicatory law, rendered a judgment in favor of the defendant.

It has been a mooted question, both in England and here, what contracts of this kind should be considered contracts for work, and as such not within the statute, or else contracts for the sale of goods or chattels, and as such within it.   Perhaps no subject in the law has been more refined upon, with results less satisfactory.

As courts in former times did not view the statute with great favor, most of the earlier decisions were departures from its literal construction.   A distinction was made between chattels completed at the date of the agreement, and those to be completed, between incompleted chattels on which the work was subsequently done for the vendor's benefit, and those on which the work was done for the vendee's benefit; between cases where the material formed the main value and those where the work formed the main value.   Courts in

various jurisdictions held that the former class was within the statute, and the latter was not, but courts in the various jurisdictions putting their rulings on almost as many different propositions as the case in its nature would admit of.

Perhaps no better illustration can be furnished of the unsatisfactory results that necessarily arise from an attempted discrimination of cases wherein the ultimate object of the contract is the delivery of the chattel, than the fact that the rule laid down by one of the greatest jurists of the land, is, as a rule of general application, far from satisfactory. " When the contract is a contract of sale," says Chief Justice Shaw, in *Mixer v. Howarth*, 21 Pick. 205, "either of an article then existing, or of articles which the vendor usually has for sale in the course of his business, the statute applies to the contract, as well where it is to be executed at a future time, as where it is to be executed immediately. But where it is an agreement with a workman, to put materials together and construct an article for the employer, whether at an agreed price or not, though in common parlance it may be called a purchase and sale of the article, to be completed *in futuro*, it is not a sale until an actual or constructive delivery and acceptance, and the remedy for not accepting is on the agreement." The elements of uncertainty introduced into this definition are, " articles which the vendor usually has for sale" in the first sentence, and "putting materials together and constructing an article" in the second part, which is used without qualification, and applicable alike to articles which the vendor usually has for sale, and to such as he has not. Thus it came that in that case the sale of a buggy completed to order was held not to be within the statute of frauds, although the vendor was a dealer in buggies and had them usually for sale, while in the subsequent case of *Clark v. Nichols*, 107 Mass. 547, the sale of plank, to be sawed

thereafter to certain specified dimensions according to the vendee's order, was held to be a sale, and as such within the statute of frauds.

It was not until 1861 that the decision in *Lee v. Griffin*, 1 B. & S. 272, set the mooted question finally at rest in England, by the very simple definition that, "when the subject-matter of the contract is a chattel to be afterwards delivered, then the cause of action is goods sold and delivered, and the seller cannot sue for work and labor." This statement of the rule, which is nothing else but a statement that the proper way to construe the statute is to construe it according to its literal meaning, at once met the approbation of the courts there, and has since been the settled construction in England.

The case has been cited with approval by the supreme court of New Hampshire in *Prescott v. Locke*, 51 N. H. 94, while the courts of some of the other states, without occupying quite as advanced ground, were unquestionably drifting in the same direction. *Burt v. Bailey*, 21 Minn. 403 ; *Atwater v. Hough*, 29 Conn. 508.

The courts of New York were at an early date committed to a more liberal construction of the statute, mainly on the strength of earlier English decisions ( *Crookshank v. Burrell*, 18 Johns. 58 ), yet after the decision in *Lee v. Griffin*, *supra*, did not hesitate to give sanction to the rule then laid down as far as compatible with their former holding. Thus in *Cooke v. Millard*, 65 N. Y. 360, that court said : " Were this subject now open to full discussion upon principle, no more convenient and easily understood rule could be adopted than that enunciated in *Lee v. Griffin*. It is at once so philosophical, and so readily comprehensible, that it is a matter of surprise that it should have been first announced at so late a stage in the discussion of the statute. It is too late to adopt it in full in this state. So far as authoritative decisions have gone, they must

be respected, even at the expense of sound principle. The court, however, in view of the present state of the law, should plant itself, so far as it is not precluded from doing so by authority, upon some clearly intelligible ground, and introduce no more nice and perplexing distinctions."

The question has never received direct adjudication from any court of final judicature in this state. In *Wharton v. Missouri Car Foundry Co.*, 1 Mo. App. 577, 581, Judge BAKEWELL intimates that "a contract for goods to be manufactured, blending prices and compensation for work, skill and material, so that they cannot be discriminated "( *sic* ) is not within the statute, but the remark was *obiter*, as the contract in that case was in writing. As far as the courts of this state are committed at all, they are committed to a strict construction of the statute. *Delventhal v. Jones*, 53 Mo. 460.

Such being the state of the law here leaves us at liberty to adopt, among the many conflicting constructions placed upon that part of the statute by other courts, the one which makes its meaning the clearest, is most in consonance with its letter, and is likely to lead to the least complications, and we do not hesitate to say that that construction is the one adopted in *Lee v. Griffin*.

It is essential that the laws of every people, and above all those of a free people whose only sovereign is the law, should be written in plain and unambiguous characters, so that he who runs may read. If this be true in every case, it is all important in questions of universal and daily occurrence, such as sales. No law which is not certain can be just.

It has been suggested that, as the statute originated in England, we should adopt that interpretation of the section which the highest judicial tribunals of that country have given to it. It is said in *Skouten v. Wood*, 57 Mo. 382, that the construction of an act given to it by

a state or country where it originated would be very persuasive if not conclusive that our legislature, in adopting it, meant to adopt it as construed by the judicial authorities of that state or country. That rule, as there stated, is founded on the presumption that the judicial branch of the government where the statute originates is the most competent to determine its meaning and effect. It seems to result from this that the rule can be of value only when the construction put upon the statute in that jurisdiction has been uniform. If it is to be presumed that the judiciary of England is most competent to determine the meaning and effect of this statute, because it originated there, it cannot be further presumed that it is less competent to do so at one time than at another. As the true construction of this particular section of the statute by the English courts, either prior or subsequent to its adoption in this state, was anything but uniform, until the decision in *Lee v. Griffin*, there is no sound reason why any of the various other constructions adopted by the courts of England should be adopted in preference to the final and now well-settled rule adopted in *Lee v. Griffin*.

The section of the statute of frauds which is under consideration establishes a rule of evidence and not a rule of property. The statute itself is one of public policy. All considerations of an equitable nature are therefore to be disregarded. No vested rights can be disturbed by the adoption of any construction.

We have seen proper to discuss the subject thus fully, more on account of our desire to furnish some intelligent rule for the guidance of trial courts, than on account of the case at bar, as the judgment herein might have been affirmed on much narrower grounds. The plaintiff is a dealer in the goods. The work to be done to finish them was inconsiderable, in fact nominal, and that work, as stated in the identical case of *Flint v. Corbitt*, 6 Daily, 430, was done for the benefit of the

vendor. There was therefore substantial evidence tending to show that both parties intended the contract to be a contract of sale. That intention the court submitted to itself as a question of fact and whether its finding thereon adversely to plaintiff is assignable for error at all, may be well doubted.

In the views herein expressed Judge PEERS concurs, and with his concurrence the judgment is affirmed. Judge THOMPSON dissents.

THOMPSON, J., delivered a dissenting opinion.

The grounds of my dissent from the opinion of the court which has been delivered in this case are the following :

The seventeenth section of the English statute of frauds was first enacted in this state in the Revision of 1825 ( Mo. Rev. Stat. 1825, p. 214 ), although the fourth section had been enacted as early as 1815. At the time when the seventeenth section was thus adopted in this state from the English statute, it had received in England a settled interpretation contrary to the opinion of my associates. It is a principle in the jurisprudence of this state that when the legislature adopts a statute from another jurisdiction, which has, prior to its adoption, received in such other jurisdiction a settled interpretation through the decisions of the judicial courts, our legislature is presumed to intend that the same interpretation shall be put upon it by our courts. *Skouten v. Wood*, 57 Mo. 380. This rule of interpretation has been declared by our supreme court to be " the settled practice " of that court. *Skrainka v. Allen*, 76 Mo. 384, 389. In *Skouten v. Wood, supra*, it was said : " That construction of the act given by the courts of the state or country in which it originated would be very persuasive, if not conclusive evidence, that our legislature, in adopting it, meant to adopt it as construed by the judicial authorities of the state where it originated." This

language was repeated and the principle re-affirmed in *Snyder v. Railroad*, 86 Mo. 613, 618. This principle has been several times followed and applied by this court. *Daudt v. Musick*, 9 Mo. App. 169, 175 ; *Slate v. Mason*, 15 Mo. App. 141, 147.

That the construction of the seventeenth section of the statute of frauds, in the particular now involved, was settled contrary to the opinion filed by my associates, is clear of all doubt. The question first came before the English judiciary in *Towers v. Osborne*, 1 Strange, 506, before Pratt, C. J., the report of which case is as follows : " The defendant bespoke a chariot and when it was made refused to take it ; and in an action for the value, it was objected, that they should prove something given in earnest, or a note in writing, since there was no delivery of any part of the goods." But the chief justice ruled this not to be a case within the statute of frauds, which relates only to contracts for the actual sale of goods, where the buyer is immediately answerable, without time given him by special agreement, and the seller is to deliver the goods immediately.

The question next came before Lord Mansfield in *Clayton v. Andrews*, 4 Burr. 2101. There the defendant agreed to deliver one and one-half loads of wheat to the plaintiff, within three weeks or a month, at a given price, to be paid for on delivery, which wheat was understood by both parties to be at the time unthreshed. No part of it was delivered, nor any earnest-money paid, nor any memorandum in writing made. It was ruled, on the authority of the preceding case, that the case was not within the statute. The ground of the decision was that the statute did not apply to contracts to be executed in the future, but applied only to sales of articles which were capable of delivery at the time of the contract in the condition required.

The question next came before the common pleas in

1792 in *Rondeau v. Wyatt*, 2 H. Bl. 63. In that case the defendant, who was a miller, had agreed orally to sell and deliver three thousand sacks of flour to the plaintiff, which flour was to be put in sacks which the plaintiff was to send to the defendant's mill, and was to be delivered by the defendant on board certain vessels provided by the plaintiff in the river Thames. It was held that this contract was within the statute of frauds. Here for the first time, the court of common pleas denied the authority of the two previous decisions, both of which had been rendered in the King's Bench, in so far as they held that the mere circumstance that the contract was *executory*, that is, that the goods were not presently capable of delivery, did not take the case out of the statute. But it was conceded in the opinion of the court, which was delivered by Lord Ellenborough, C. J., that those cases were rightly decided on their facts. He said : "The case of *Towers v. Sir John Osborne*, 1 Strange, 506, was plainly out of the statute, not because it was an executory contract, as has been said, but because it was for work and labor to be done, and materials and other necessary things to be found, which is different from a mere contract of sale, to which species of contract alone the statute is applicable. In *Clayton v. Andrews*, 4 Burr. 2101, which was on an agreement to deliver corn at a future period, there was also some work to be performed, for it was necessary that the corn should be threshed before the delivery. This, perhaps, may seem to be a very nice distinction, but still the work to be performed in threshing made, though in a small degree, a part of the contract."

In 1796, the question again came before the King's Bench, this time under the presidency of Lord Kenyon. A sale of goods by sample for more than ten pounds in one place, to be afterwards delivered at another place, was held to be within the statute ; the court re-affirming *Rondeau v. Wyatt, supra,* and denying *Towers v.*

*Osborne, supra,* and *Clayton v. Andrews, suprá,* in so far
as the last two cases held that executory contracts were
not within the statute ; though Lord Kenyon would not
pretend to say that those cases were not rightly decided
on their particular circumstances,—calling attention to
the fact that they were cases involving contracts for
work and labor, where the thing contracted for did not
exist at the time. Ashhurst, J., was of the same opinion,
and Grose, J., said that if *Towers v. Osborne* meant
only that such contracts as were incapable of being exe-
cuted at the time were not within the statute, then the
decision was right. This case, then, clearly re-affirmed
what had been ruled in *Rondeau v. Wyatt, supra,* that
the two earlier cases had been correctly decided on their
facts on the ground that the thing contracted for did not
exist at the time.

In 1808, the question again came before the com-
mon pleas, under the presidency of Lord Mansfield, in
*Mucklow v. Mangles,* 1 Taunt. 318, where it appeared
that defendant, who was a barge-builder, had under-
taken to build a barge for one Pocock. Before the work
was begun, Pocock advanced to the defendant money
on account. As the work proceeded, he paid him
more, until he had paid him the whole value of the
barge. When it was nearly finished Pocock's name
was painted on the stern. After it was completed, but
before it was delivered, the defendant committed an act
of bankruptcy, and the barge was seized by the sheriff
under an execution against him. It was held ( though
not with special reference to the statute of frauds ) that
this was not a contract of sale. The court proceeded
upon the ground that if the thing be in existence at the
time of the order, the property of it passes by the con-
tract, but not so where it is to be made.

The question was next stirred in *Graves v. Buck,* 3
Maule & S. 178, in the King's Bench, in 1814, where it
was ruled that a contract for the purchase of a quantity

of oak pins, for the price of upwards of ten pounds, which were not then made but were to be cut out of slabs and delivered to the buyer, was not within the statute. Lord Ellenborough said: "The subject-matter of this contract did not exist *in rerum natura;* it was incapable of delivery and of part acceptance, and where that is the case the contract has been considered as not within the statute of frauds. In *Rondeau v. Wyatt,* the thing contracted for existed in the very shape and substance in which it was to be delivered; and it was held that the circumstance of its being to be shipped on board vessels to be provided by the buyer for exportation did not take the case out of the statute. And that is very good sense; for if the thing be capable of delivery, at the time, why is it not done? But the same reason does not apply where the goods are not delivered." This was the last decision rendered on the subject in England prior to the year 1825, and it is distinctly opposed to the construction put upon the statute by my associates.

Prior to the year 1825, the question had come before the American courts for decision in one case only, and that was the case of *Crookshank v. Burrell,* 18 Johns. (N. Y.) 58, *anno* 1820. It had previously been ruled in *Bennett v. Hull,* 10 Johns. 363, that this clause of the statute applied to executory contracts,—this is to contracts for future delivery, as well as to contracts for present delivery. But the question which we have under consideration came for the first time before the supreme court of New York in *Crookshank v. Burrell, supra,* where the plaintiff had contracted to make a wagon for the defendant by a certain day, for which he was to receive payment in lambs at a certain price per head. The court, reviewing the English decisions above quoted, ruled, in an opinion by Spencer, C. J., that this was a contract for work and labor, and not a contract of sale, and that it was hence not within the statute. The

learned chief justice added: "However refined this distinction may be, it is well settled, and it is now too late to question it."

I equally say that in the year 1825, when the English statute was transplanted into this state, its construction in this particular was well settled and well settled contrary to the construction which my associates now put upon it. Our legislature having adopted it must be presumed to have intended that our courts, in construing it, should give to it the meaning which had been thus put upon it in the parent jurisdiction from which we may be supposed to have borrowed it. Or, if we could be supposed to have borrowed it from New York, the same conclusion would follow. The statute with this interpretation upon it thus came to us as a rule of property; and it is no more within the competency of this court to put a different interpretation upon it from that which the legislature has enacted, than it would be to repeal it altogether, or to enact a new statute in its place. We have no power to deal with the question as a *res nova*, because we are merely judges appointed to administer the law, and are not legislators appointed to change the law.

But if I felt at liberty to enter upon the province of a legislator, I am by no means clear that I should put upon this statute the interpretation which my associates put upon it. This interpretation has sprung up chiefly in consequence of the decision in *Lee v. Griffin*, 11 Best. & S. 272, within the last thirty years, and is a judicial novelty. Prior to that time, the statute had for near one hundred and fifty years borne a different interpretation, and for many years later the same interpretation was maintained in American and Canadian jurisdictions. *Low v. Andrews*, 1 Story ( U. S. ) 38; *Bird v. Muhlinbrink*, 1 Rich. L. ( S. C. ) 199, *anno* 1845; *Lane v. Melville*, 3 Upp. Can. Q. B. ( O. S. ) 127;

*Finney v. Apgar*, 2 Vroom. ( N. J.) 268 ; *Rentch v. Long*, 27 Md. 197, *anno* ——— ; *Gadsden v. Lance*, 1 McMull Eq. ( S. C. ) 90, *anno* ——— ; *Greene v. Brookins*, 23 Mich. 52 ; *Sewall v. Fitch*, 8 Cow. ( N. Y. ) 215 ; *Mixer v. Howarth*, 21 Pick. ( Mass. ) 205. It has been often said that the judges in the earliest decisions were unfriendly to the statute of frauds and construed it with unreasoning strictness. It may be answered that there were many more reasons for enlarging it by construction at the time when it was enacted than exist at the present day. It was enacted in the most dissolute period of English history. Dishonesty and corruption honeycombed every department of public life. The ministers of the king enriched themselves by corrupt practices at the expense of the public. The king himself, though a Catholic, was not ashamed to keep up the pretense of being a Protestant. He was not ashamed to attempt to support his government independently of his parliament by receiving secret largesses from the king of France, in pursuance of a secret treaty. These largesses, and other money wrung from his impoverished subjects by taxation, were not expended in repairing his rotting navy, but in building palaces for courtesans. The judges of this most corrupt and licentious monarch held their offices at his pleasure, and were subservient to the influence of his most corrupt court. In the courts in which they presided, perjury was the rule and honest testimony the exception. The astonishing perjuries of Oates and Dangerfield were, at the time when this statute was enacted, hurrying to the scaffold many of his honest, pious and loyal subjects. No lawyer or legislator of that day dreamed that the time would ever come when men who had an interest in the event of a law-suit could be trusted to tell the truth under oath therein, or could be admitted as witnesses ; and consequently, in transactions between buyer and seller, it generally happened that those who were alone personally

cognizant of the terms of the contract were incapable of testifying as to it in the courts of justice. This furnishes an additional reason why important contracts between buyer and seller should be required to be put in writing, or else executed on the spot, either in whole or in part.

But the statute only applied to important contracts. It did not apply to contracts where the consideration was less than six pounds. Since that time the purchasing power of money has diminished many-fold. At the close of the reign of Charles II., the average value of the horses in the kingdom was fifty shillings. A pair of horses of average quality could be bought for five pounds and a transaction of that magnitude was therefore not within the statute. While the purchasing power of money has not since that time declined equally in respect of all other commodities, and while it may even have increased in respect of certain articles now manufactured by machinery, it has declined many-fold in regard to agricultural products and in regard to most of the necessaries of life. The minimum limit of six pounds shows that it was never even contemplated by parliament in enacting it, that it should interfere with the ordinary practices of retail trade. But if the interpretation put upon it by my associates is correct, the tailor who now makes an ordinary suit of clothing for a customer must demand his written order or the payment of earnest-money. That such demands are not made according to the habits of business, I need scarcely suggest; and if the statute is to have this interpretation it will become a monumental illustration of the folly of an attempt on the part of the legislature to codify the business customs of the people.

In ordinary cases, a man who represents to another a given state of facts, on the faith of which that other acts to his disadvantage, is estopped from thereafter denying the existence of such state of facts,—and this on the ground that to allow him afterwards to do so

would be to work a fraud upon the other party. But the statute, with the interpretation now put upon it, becomes a mere engine of fraud. A man goes to a manufacturer and induces him to cut up his material and to manufacture it in a peculiar way, to suit his peculiar taste, or to fit the measurement of his body, and then refuses to receive the manufactured articles when tendered, on the ground that he had not given an order for them in writing. Is the law to allow him to do this? At the time when our legislature adopted this statute the settled interpretation which it had received did not allow of its being made use of to perpetrate this species of fraud; and I do not believe that our legislature of that day ever intended to sanction such obvious injustice.

I think that the judgment ought to be reversed and the cause remanded.