PEOPLES BANK OF MEMPHIS, By O. H. MOBERLY, Commissioner of Finance, Appellant, v. H. H. JONES, IDA JONES, A. C. LOVE, H. A. KERR, C. C. FOGLE, Trustee, and H. O. JONES.—93 S. W. (2d) 903.

Division One, April 23, 1936.

*Smoot & Smoot* for appellant.

*Earle E. Fogle* for respondents.

BRADLEY, C.—This is an action commenced August 23, 1933, in the name of the Peoples Bank of Memphis, Missouri, by the Commissioner of Finance, in charge of the bank, to set aside a deed of trust and a warranty deed to 180 acres of land, and to have declared paid and discharged a second deed of trust on said lands. Petition was filed in Scotland County, but the cause went on change of venue to Knox County, where trial before the court resulted in a judgment for defendants. Motion for a new trial was overruled and plaintiff appealed.

The deed of trust and warranty deed sought to be set aside, and the deed of trust sought to be adjudged as paid off and discharged, were executed by defendants, H. H. Jones and wife on April 23, 1931. We do not deem it necessary to refer at length to the pleadings. It is sufficient to say that the petition, as to the deed of trust and warranty deed sought to be set aside, is bottomed on the theory that these conveyances were fraudulent as to creditors. The answer is joint and admits the execution of the instruments in question, but denies that they were executed to defraud creditors; and denies that the second deed of trust was paid off and discharged.

Plaintiff bank, appellant here, makes several separate assignments of error, but they all go to the contention that the finding and judgment for defendants is not supported by the evidence.

Defendants, H. H. Jones and his wife, Ida, grantors in the conveyances in question, were, at the time this cause was filed, judg-

ment debtors to plaintiff in the sum of $1580, plus costs, $159, which included an attorney's fee; said judgment is based on a note given plaintiff by defendants, H. H. Jones and wife. These defendants, at the time of the conveyances in question, also owed defendant, Love, a note for $3000, which note, prior to the transactions involved here, was secured by a first deed of trust on the homestead in Memphis, Missouri, of defendants, H. H. Jones and wife. Defendant, H. O. Jones, is a son of H. H. and Ida, and is the grantee in the warranty deed; defendant, Fogle, is the trustee in both deeds of trust mentioned; defendant, Love, is beneficiary in the first deed of trust, and defendant, Kerr, is beneficiary in the second deed of trust, the one claimed to be paid.

Plaintiff's judgment against defendants, H. H. Jones and wife, was procured May 19, 1931, in the Scotland County Circuit Court, in which county the land is located, and the deeds of trust on and warranty deed to the land were executed on April 23, 1931, and recorded prior to plaintiff's judgment. Defendants, H. H: Jones and wife, were served with process in plaintiff's suit on its note on April 21, 1931, two days prior to the execution of the deeds of trust and warranty deed. Notwithstanding the deeds of trust and the warranty deed, plaintiff under its execution against defendants, H. H. Jones and wife, had the lands levied upon and sold and plaintiff was the purchaser at the sale. The sale was had on May 19, 1932.

We might state here some history which figures in this cause as appears from the record. Defendant, H. H. Jones, was plaintiff in Jones v. Jones et al., 333 Mo. 418, 63 S. W. (2d) 146, which cause involved the same 180 acres of land as involved here. In that case H. H. Jones, a defendant here, obtained, on December 22, 1930, a decree in the circuit court vesting in him the title to said lands. Appeal was taken in that case February 10, 1931. H. H. Jones, according to plaintiff bank, promised to give to it a deed of trust on these lands, but did not do so. It will be noted that plaintiff commenced its suit on its note against H. H. Jones and wife and that they made the conveyances here in question not long after H. H. Jones obtained his favorable decree in the circuit court in Jones v. Jones, et al. The decree in that case was affirmed in this court on August 9, 1933, and, as stated, plaintiff commenced the present cause August 23, 1933.

The background which gave rise to the deed of trust to defendant, Love, is as follows: In 1922, defendant, H. H. Jones, borrowed $2000 from Love and secured the note given therefor by first deed of trust on his homestead in Memphis, Missouri. When this note became due, the loan was increased $1000, the old note taken up and a new one given for $3000, which note for $3000 was dated September 10, 1923, and was secured by a first deed of trust on the same property, the homestead. The note for $3000 was made pay-

able to Melba Moore, an office girl, but assigned by her to Love, who made the loan. This $3000 note was carried along, with payments at intervals, until April 23, 1931. On this date, defendants, H. H. Jones and wife, in order to take up this $3000 note, executed two notes to Love, each due in three years. One of these notes was for $2000 and the other for $1000. To secure the $2000 note a first deed of trust (in question here) was given, and to secure the note for $1000 a first deed of trust (not in question here) was given on the homestead, and the lien of the $3000 deed of trust on the homestead released. The facts concerning the second deed of trust (the Kerr deed of trust) involved here are that H. H. Jones owed one Elmer Israel a note for $1000 due one year after date, and dated February 28, 1931, upon which note Kerr was surety for Jones. April 23, 1931, H. H. Jones and wife, to secure Kerr executed their note to Kerr for $1000, secured by a second deed of trust on the lands in question. When the Elmer Israel note became due, defendant, H. O. Jones, at his father's request, sent him a check for $1000. H. H. Jones, the father, cashed the check and paid to Israel $1080, the amount due on the note, furnishing $80 himself to cover the interest. Upon receipt of the $1080 Israel endorsed the note in blank and without recourse and delivered it to H. H. Jones, who in turn, as we understand the record, sent it to his son, H. O. Jones, a dentist, at Gering, Nebraska. Further facts appear, infra, respecting the Elmer Israel note and the Kerr deed of trust.

There is no history or background, prior to April 23, 1931, concerning the warranty deed which plaintiff seeks to set aside. This deed was made subject to the Love deed of trust for $2000, and subject to the deed of trust for $1000 to secure Kerr for being surety on the Israel note. The warranty deed recites a consideration of $300, which amount was paid by check by defendant, H. O. Jones. The check was made payable to H. H. Jones and he turned it over to Mrs. Anna Beard to pay a note for $300 owed by him. But more appears hereinafter concerning the warranty deed.

We first consider the $2000 Love deed of trust. It is alleged and plaintiff contends that Love knew of the alleged fraudulent purpose of defendant, H. H. Jones, in executing to Love this deed of trust. H. H. Jones testified that his purpose in executing the deeds of trust to Love on April 23, 1931, was to extend time of payment; that "the papers were past due." Then he was asked: "What other purpose, if any, did you have? A. One object was to protect my creditors . . . Q. Didn't you have in mind that you had a homestead over and above the mortgage? A. No. Q. How come you to determine on April 23rd to make these deeds? A. To protect my creditors. Q. When did you determine to do it? A. I don't know. Q. Wasn't the purpose to prevent the Peoples Bank from collecting their claim? A. To protect my creditors. Q. Why didn't you

do it before? A. Because I didn't . . . Q. You determined at the time this notice (the summons in the bank's suit on its note) was served on you that you would protect your creditors? A. I wanted to protect my creditors. . . . Q. Did you have any other creditors you wanted to prefer? A. I gave Mr. Kerr a note. Q. What other creditors did you want to protect? A. That is all." H. H. Jones said that on April 23, 1931, he owed around $8000, and there is no contention that he was not insolvent on that date. Under this record there is no reasonable conclusion that can be reached as to the purpose H. H. Jones had in executing the instruments on April 23rd, except that he intended to make a preference among his creditors and at the same time to reduce the lien on his homestead from $3000 to $1000. It is also clear that H. H. Jones anticipated a judgment in plaintiff's suit on its note, and that his purpose was to place what property he had beyond the reach of execution.

That Love's note for $3000 was bona fide is not here questioned. Both Love and H. H. Jones were examined at length about that note, but there is nothing in the record to indicate that Love was not a bona fide creditor in the amount he claimed. Love resided at St. Joseph, Missouri. Shortly before April 23, 1931, he and H. H. Jones had some correspondence, but none of that was available. Love went to Memphis, Missouri, about April 29, 1931, at the request of H. H. Jones. The deeds of trust to him (the one in question here and the one on the homestead) were then already executed, but not recorded. He arrived in Memphis, at night, and had a conversation with H. H. Jones that night. Love said that he knew on April 23rd that H. H. Jones had been sued by plaintiff bank on its note. He also said that Jones had advised him of his (Jones') financial condition. "Q. And you knew that the suit (plaintiff's suit on its note) had been pending and that he (Jones) was recently served with process? A. He told me those points. Q. You at that time had a mortgage for $3000 on his home? A. Yes, sir. Q. You knew that home? A. Yes, I saw it built. Q. You knew it was an eight or nine room house? A. Yes, sir. Q. It had modern conveniences, hot water heat and a bath? A. Yes, sir. Q. You knew it was nicely located with reference to town? A. Yes, sir. Q. After he explained all of this situation to you, his financial condition and that he was sued and received service of process, what did he ask you to do, if anything? A. He asked me to reduce the mortgage on his home. Q. Have you a copy of that letter? A. No. Q. Was it by letter? A. Yes, and I talked to him about it; the mortgage (on the homestead) was too heavy. Q. Tell the court why you reduced it to $1000 on the home. A. The facts were that he realized—I realized and Mr. Jones realized—that $3000 was too heavy a mortgage for the property (the homestead) and he then spoke of this land and we together agreed that I take $2000 on the land and leave $1000 on

the home and that he would give me the two notes, one for $1000 on the home and one for $2000 on the land, with the deeds of trust. Q. He had explained to you beforehand his title to this land had been appealed from and was pending in the Supreme Court of the State of Missouri? A. That the title was in jeopardy. Q. And you knew that? A. Yes. Q. How did you arrive at $1000? A. It was as much or more than I would give for the house. Q. Was $2000 as much or more than you would give for the land? A. Any 180 acres of land in Missouri was good for $2000. Q. When the title was good? A. I was taking a shot—I figured if it had to come to a foreclosure (on the homestead) I couldn't close out for over a $1000. Q. Did you investigate the value of real estate in 1931? A. Yes, sir . . . Q. You stated that if unsuccessful in that lawsuit (Jones v. Jones et al.) that you would trust Mr. Jones to— A. (Interrupting): I just said this—that I would take the transaction and feel satisfied about it, (H. H. Jones), being the man he was and the friends we were, that if he lived he would make it good, I would lose nothing in the transaction although the title flickered and if he failed in the possession of the land, (in Jones v. Jones et al.) I would lose nothing. He would make it good I knew. . . . Q. You thought, Mr. Love, that that transaction you were making and transacting was that of an ordinary prudent business man— was one that an ordinary prudent business man would transact in an ordinary businesslike manner? A. I realized in the transaction that I was losing no ground and I was just as well satisfied as I would have been and really better satisfied with the transaction in getting the $2000 on the farm and $1000 on the house instead of $3000 on this (the homestead). Q. If the title was good? A. Well, I was taking those chances. Q. Didn't it occur to you in that transaction that it wasn't a transaction that a prudent man would make? A. No, sir.''

Love's deeds of trust were not recorded until he had talked the situation over with H. H. Jones, and after that he and H. H. Jones went to the courthouse together to have them recorded. We think it is clear that Love knew the purpose of H. H. Jones, when he, Love, accepted the $2000 and $1000 notes, secured, respectively, on the lands and the homestead. Since Love had knowledge of H. H. Jones' purpose respecting the $2000 deed of trust, and since Love then held a mortgage on the homestead to secure him, he was not an unsecured creditor who might be preferred, if he was fully secured by his mortgage on the homestead. [Farmers Bank of Higginsville v. Handly, 320 Mo. 754, 9 S. W. (2d) 880, l. c. 893.] But, ''if a creditor takes property from his insolvent debtor for the sole purpose of liquidating or securing the debt, mere knowledge on the part of the favored creditor that the effect of the conveyance will

be to defeat other creditors, and knowledge that the debtor in making the conveyance does so for that purpose, will not render the deed invalid in the hands of the favored creditor.'' [Gust v. Hoppe, 201 Mo. 293, 1. c. 300, 100 S. W. 34.] In view of the law applicable to Love's situation the value of the homestead is decisive as to the validity of his $2000 deed of trust on the 180 acres of land. It appears, supra, the value that he placed on the homestead. He had formerly resided in Memphis, and says that he saw the house built, and according to his estimate the value of the homestead in April, 1931, was not in excess of $1000, the amount of the deed of trust he took back on the homestead. H. H. Jones purchased the homestead in 1920 for $3500. Plaintiff's witness, T. C. Smith, assistant cashier of plaintiff bank, prior to its closing, testified that the reasonable market value of the homestead April 23, 1931, was $3000. W. P. Briggs, who resided in Memphis, placed the market value in April, 1931, at $3500. Walter Drummond of Memphis, a carpenter and a witness for defendants, and who prior to 1935, lived near the homestead property, placed the reasonable market value in April, 1931, at around $1500. Noah Baker, defendants' witness, placed the value of this property in April, 1931, at from $1200 to $1400. This witness lived about 200 feet from the homestead place and had known it for several years. Charles Bridgewater, defendants' witness and a brick mason, and who resided in Memphis, placed the value in April, 1931, at about $1500. It is urged in plaintiff's brief that the evidence as to value by defendants' witnesses should be believed. There is nothing here to support such contention. The mere fact that evidence is conflicting is no reason to support such contention. The chancellor below saw these witnesses and had opportunity to observe their demeanor on the stand, and from the conclusion reached, the inference is that he chose to believe defendants' evidence instead of plaintiff's as to value of the homestead. We are not, in this equity case, bound by the finding on the facts below, but it is elementary that we should and do give due deference to the finding of the chancellor. It is true that the trial chancellor did not make a specific finding as to the value of the homestead, but, the inference, as stated, is that he took defendants' evidence on value, instead of plaintiff's, otherwise he would not have found, it may be assumed, that Love's deed of trust for $2000 on the land was valid. The value placed on the land in April, 1931, was $2100 to $2400. Under the evidence of defendants as to the value of the homestead, which we adopt, and in view of the value of the land, and the Kerr deed of trust hereinafter held valid, Love was not reasonably well secured, prior to April 23, 1931, by his $3000 deed of trust on the homestead, and, under the facts, we rule that Love's $2000 deed of trust on the lands was not invalid. [Gust v. Hoppe, supra.]

■ We come now to the situation of defendant, H. O. Jones. He occupies a kind of dual position. He is the grantee in the warranty deed and is holding the Israel note. Plaintiff pleaded that there was no consideration for this deed. But, as shown, the $300 recited in the warranty deed as the consideration, was actually paid by H. O. Jones, and that amount, on the basis of the value of the land was more than H. H. Jones' equity in the land was worth, when the Love and Kerr deeds of trust are taken into consideration. However, the fact that H. O. Jones paid all the equity in the land was worth, will not necessarily make this conveyance valid. H. H. Jones, the grantor in the warranty deed, was insolvent. The deed was not taken in payment of any pre-existing debt, although it is so pleaded. H. O. Jones purchased his fathers' equity ''for a fresh consideration,'' as such is expressed in Gust v. Hoppe, 201 Mo. 1. c. 300, 100 S. W. 34, but the full consideration paid was used by H. H. Jones to pay a pre-existing bona fide debt. We may assume, for the purpose here, that H. O. Jones knew that his father was insolvent at the time of the execution and delivery of the warranty deed, and knew that the purpose of his father in executing the questioned instruments on April 23, 1931, was to favor certain creditors and get what property he had beyond the reach of the anticipated judgment and execution of plaintiff. On such assumption, under the facts was the warranty deed fraudulent as to creditors and void?

In Farmers Bank of Higginsville v. Handly, supra, the court had in hand a question in some respects similar to the one here, and said (320 Mo. 754, 9 S. W. (2d) 1. c. 891): ''The determinative question in the instant case, to our minds, is wholly one of fact, for the controlling and applicable law of the case is well settled by the decisions of this court. In fact, the respective parties, in their briefs herein, apparently concede the law (as heretofore announced by this court) to be that, if the purpose of defendant Ross Handly, in conveying the land in controversy to James A. Greer, was to put it out of reach of the plaintiff bank in anticipation of the executions that would in course follow the judgment he apprehended the bank would recover in the suit then pending upon his unsecured promissory notes, held and owned by the bank, then it was a fraudulent transaction on the part of Handly, the seller; and, if the defendant James A. Greer, the ostensible buyer, made the purchase of the land and took the conveyance with knowledge of the fraudulent purpose on the part of the seller, and with the intent to assist him in the accomplishment of such purpose, then it was a fraudulent transaction on the part of both said defendants, and the sale should be set aside as to the plaintiff bank, unless the rights of subsequent and innocent purchasers of the land have intervened,'' citing Gust v. Hoppe, supra, and Barber v. Nunn, 275 Mo. 565, 205 S. W. 14;

St. Francis Mill Co. v. Sugg, 206 Mo. 148, 104 S. W. 45; Dougherty v. Cooper, 77 Mo. 528; Frederick v. Allgaier, 88 Mo. 598; Bishop v. Bishop (Mo.), 228 S. W. 1065.

In the Farmers Bank of Higginsville case, supra, the purchaser, Greer, paid nothing to the grantor. He merely assumed the burden of prior deeds of trust on the land. In Gust v. Hoppe, 201 Mo. l. c. 300, 100 S. W. 34, cited supra, it is stated that "one who is not a creditor, who has no existing interest to preserve or protect, who purchases merely for a fresh consideration, is not protected in his purchase if he knows that the seller is selling for the purpose of putting his property out of the reach of execution," citing Sexton v. Anderson, 95 Mo. 373, 8 S. W. 564; Wall v. Beedy, 161 Mo. 625, 61 S. W. 864. Greer's situation in the Farmers Bank of Higginsville case is different from that of H. O. Jones, in the present case, in that Greer paid nothing to his grantor, while H. O. Jones actually paid the reasonable value (and perhaps more) of the equity and the full consideration paid was used by the grantor, H. H. Jones, to pay a pre-existing bona fide debt. In 27 Corpus Juris, page 512, section 178, it is stated that, "if the purchaser has the knowledge of, and actively participates in, the seller's fraudulent intent, the sale is invalid notwithstanding the purchase money is applied to the payment of bona fide debts of the grantor. . . ." As supporting the text quoted concerning the application by the grantor of the purchase price to the payment of a bona fide debt, Kurtz v. Troll et al., 175 Mo. 506, 75 S. W. 386 is cited. In the Kurtz case the facts were: Wendell Schorle, a merchant, was insolvent. He sold, for its reasonable value, a portion of his stock of merchandise to Kurtz, who gave his notes, secured by chattel mortgage on the goods sold, for the purchase price. The vendor turned these notes over to his brother to pay a bona fide debt. An attachment suit was instituted by a creditor of the vendor and the goods sold to Kurtz were seized and sold in the attachment case. Kurtz sued the sheriff, Troll, and the sureties on the attachment bond, for conversion. The defense was that the vendor conveyed the goods to defraud creditors and that the vendee, Kurtz, at the time of the sale, knew of this purpose and was not protected. Kurtz's theory was that he paid full value for the goods and that his vendor used the notes, given for the purchase price, to pay a bona fide debt, and that such being so, Kurtz's purchase could not be fraudulent as to creditors. The judgment in the trial court was for Kurtz, but was reversed and the cause remanded because the court modified an instruction offered by the defendants, which modification directed, in effect, that the sale was not fraudulent unless it was found that the creditor who received the notes in payment of his debt owed by the vendor, participated in the design of the vendor to defraud his creditors, and

unless found that Kurtz, the purchaser, knew that such favored creditor was participating in such design before plaintiff, Kurtz, signed and delivered the notes and mortgage securing them. In ruling that case it was stated that "a volunteer purchaser (non-creditor purchaser) who gets title to goods sold or conveyed to hinder, delay or defraud creditors of the vendor in the enforcement of their claims, can acquire no right to the property against such creditors, if he either knew of, or participated in the purpose of his vendor, when the transaction was consummated, and this, too, irrespective of the fact that he may have paid full value for the goods. Nor could he acquire a valid title, if, after such a sale, but before payment of the price, he learned of said fraud and failed to withhold payment, provided his obligation to pay had not become so fixed, by a transfer of negotiable paper evidencing it, or otherwise, that he could not legally resist its enforcement." And it is further stated in the Kurtz case that "such a transaction (as was there) was necessarily voidable at the instance of creditors, irrespective of the payment by the buyer of the full value of the goods, *and also irrespective of the fact that the vendor assigned the notes which he received for the price of the goods to the holder of a valid demand against himself.*" (Italics ours.)

The Kurtz case reached this court by being certified on a dissenting opinion of one of the judges of the St. Louis Court of Appeals. The majority opinion of the Court of Appeals was adopted (Division Two) as the opinion of this court. The dissenting opinion of Judge BIGGS of the Court of Appeals appears in the reported case, and it appears from the dissenting opinion that the evidence tended to show that the purpose of the sale to Kurtz was "to secure or pay a debt" of the vendor to his brother, who got the purchase price notes. In other words, the dissenting opinion holds that "if the sale is a fair one," the purchaser should be regarded as a creditor purchaser, that is, a purchaser who occupies the position of a purchaser who is a bona fide creditor of the vendor. As supporting this theory the dissenting opinion cites Tennent-Stribbling Shoe Co. v. Rudy, 33 Mo. App. 196, and Sammons v. O'Neill, 60 Mo. App. 530. Without going into detail as to the facts in the cases last mentioned it is sufficient to say that they, as we read, support in principle the dissenting opinion in the Kurtz case. The Sammons case was referred to in the majority opinion in the Kurtz case, but was distinguished on the facts.

We think that the correct and reasonable rule on the question in hand, is given in 27 Corpus Juris, page 623, section 370: "A valid preference may be made by selling property to a third person for a fair price and paying over the proceeds to the creditor to be preferred, although the purchaser knows that the vendor's intent is

to make a preference, and although the sale is made on credit, the vendor taking the purchaser's notes in payment, or in part payment. *So a debtor may sell his property, in consideration that the purchase money be paid to some of his creditors, to the exclusion or postponement of others, and if it is done without any fraudulent design, and is a present application of his property to the payment of his debts, it is a valid transaction."* (Italics ours.) Among the authorities cited in Corpus Juris as supporting the italicized portion of the section quoted are Kincaid v. Irvine, 140 Mo. 615, 41 S. W. 963; Baker v. Harvey, 133 Mo. 653, 34 S. W. 853; Nichols v. Ellis, 98 Mo. 344, 11 S. W. 741. These cases, we think, support in principle, the italicized text quoted. In the Baker case, this court (Division One), quoting from Daugherty v. Cooper, 77 Mo. 531, said: "An embarrassed debtor may make sale of his property which he deems advantageous to enable him to raise the necessary means for paying off his creditors and to prevent its sacrifice at forced sale under execution, and for this purpose the law recognizes his right to sell for cash or on time."

It is stated in 12 Ruling Case Law, section 103, page 587: "The right of a debtor to sell to a third person for a fair price, the latter agreeing to pay the consideration on certain specified debts due by him, is equal to his right to prefer certain of his creditors by transferring property to them in satisfaction of their debts."

It may be inferred, we think, from the record in the instant case, that H. O. Jones, grantee in the warranty deed, knew that his father intended to use the $300 consideration, paid for the equity in the land, to pay Anna Beard. Therefore, his purchase was not like a noncreditor purchaser, who, by his purchase, aids the seller to put the purchase money in his pocket and then "tell the world" that "it is nobody's business," as did the grantor in the Gust case, supra. In the italicized portion of the excerpt, supra, quoted from the Kurtz case (175 Mo. 1. c. 512, 75 S. W. 286) the court was speaking of the facts there obtaining. That was a law case and the court was considering a complaint based on the modification of an instruction, by which modification the jury was required to find, before returning a verdict for defendants, that the creditor to whom the consideration for the sale was assigned in order to pay a bona fide debt of the vendor, participated in the fraudulent design of the vendor to defraud other creditors. In view of what the court was actually deciding in the Kurtz case, we think that the italicized portion of the excerpt quoted above from that case may be regarded as *obiter*. We see no sound reason why an insolvent debtor may not sell his property for its fair value to a noncreditor purchaser, who purchases with knowledge of the vendor's insolvency, but does so in order to enable the vendor to use the purchase price or evidence of it to pay

a bona fide debt. We are unable to see how there could be fraud on the part of H. O. Jones in aiding his father to do indirectly that which he had the right to do directly, that is, favor his creditor, Anna Beard, if he desired to do so. It is our conclusion that the conveyance by the warranty deed was valid.

We come now to the Kerr deed of trust on the land. It will be noted that this is the deed of trust that plaintiff seeks to have declared as paid and discharged, and it is also claimed that this deed of trust was fraudulent as to creditors. As appears, supra, H. O. Jones is the holder of the Israel note of $1000 owed by H. H. Jones and upon which Kerr was surety, and held the second deed of trust on the land to secure him for being such surety. H. O. Jones, as stated, furnished $1000 to his father to pay Israel. When Israel was paid the $1000, plus interest, he endorsed the note in blank and without recourse and turned it over to H. H. Jones who in turn, turned it over to his son, H. O. Jones. The note was not canceled. Israel was paid, but H. H. Jones still owed the note, but to his son. If the note was not *discharged,* Kerr was still bound as a surety thereon. The endorsement of the note in blank by Israel and its delivery to H. O. Jones did not pass anything to H. O. Jones except the note, because the Kerr deed of trust did not secure the note, but secured Kerr as surety thereon. Kerr, at the time he accepted the second deed of trust on the land, was a contingent creditor of H. H. Jones, and as such contingent creditor, could under the facts, lawfully be preferred. [Albert v. Besel, 88 Mo. 150; 27 C. J., p. 624, sec. 377.] There is no evidence to support the theory that the Israel note was extinguished as a live note by the payment of the $1080 to Israel, and there is no evidence tending to show that H. O. Jones does not intend to enforce payment of the Israel note to reimburse him (H. O. Jones) for the $1000 he furnished to pay Israel, hence, as stated, there is nothing to support the contention that the Israel note was paid off and discharged and that, therefore, the Kerr deed of trust is likewise discharged. But this will not dispose of the Kerr deed of trust. Its validity does not depend upon what H. O. Jones did as to furnishing the money to pay Israel, but upon the character of the security, if any, that Kerr released when he accepted the second deed of trust on the land. The record shows that Kerr did not have any security at all for being surety on the Elmer Israel note. The story concerning Kerr as surety as given by H. H. Jones and Kerr is that September 12, 1922, Kerr signed as surety for H. H. Jones a note for $1000 payable to one E. W. Warren. To secure Kerr for signing the Warren note, H. H. Jones gave to Kerr a note for $1000 dated September 12, 1922, due in one year and signed by H. H. Jones, H. O. Jones (defendants here), B. O. Jones and E. M. Jones. This surety note, as we may

term it, had written on the back thereof: "This note is given to save H. A. Kerr harmless from the payment of a certain note to E. W. Warren signed by H. H. Jones and H. A. Kerr." When the Warren note became due, H. H. Jones, as we understand his evidence, got the money from Frank Israel to pay Warren, and Kerr signed the note given to Frank Israel, but did not get a new surety note to protect him as surety on the Frank Israel note. This last-mentioned note ran along until February 28, 1931, when H. H. Jones got the money from Elmer Israel to pay Frank, and Kerr signed the Elmer Israel note as surety for H. H. Jones, but did not get a new surety note to protect him. All he ever had, prior to April 23, 1931, to protect him, was the note dated September 12, 1922, given to protect him on the Warren note. It is not contended by plaintiff bank that Kerr was fully secured, or secured at all, as surety on the Elmer Israel note, prior to April 23, 1931. The contention is, as stated, that the Elmer Israel note was paid off and discharged and that Kerr, therefore, was not longer bound thereon and that his second deed of trust on the land to secure him on the note was discharged. We have ruled above that the Elmer Israel note was not extinguished, so far as appears here, and that Kerr is yet bound on that note, although held now by H. O. Jones, who was not a signer on the Elmer Israel note. So it appears that Kerr was, on April 23, 1931, a bona fide contingent creditor of H. H. Jones, who had the right to favor Kerr, even though Kerr knew of the insolvency and purpose of Jones, which we do not decide. Under the facts, so far as appears, Kerr was an unsecured contingent creditor of H. H. Jones on April 23, 1931, and H. H. Jones had the right to favor Kerr if he so desired.

The judgment of the trial court should be affirmed and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.