WILLIAM F. PEIKERT, Appellant, v. HARRY REPPLE ET AL.—114 S. W. (2d) 999.

Division One, April 1, 1938.

*Frank Coffman* for appellant.

276

*Albert F. Muench* for William J. Heldmann.

HYDE, C.—This is an action in equity to set aside two trust deeds as fraudulent conveyances and to enjoin the foreclosure commenced. The petition also contained counts in ejectment and to determine title. Parties, other than defendant Repple (owner and mortgagor of the real estate), were his two daughters (*cestuis* in the trust deeds, one note made to each), the trustee named (who had advertised foreclosure), and the unknown owner or owners of the notes. A temporary injunction against foreclosure was granted when this suit was filed. Thereafter defendant, Heldmann, claimed to own both notes, asked to be made a party, and was permitted to file answer asserting such claim. No service was had on the original *cestuis* and suit was dismissed as to them. Other defendants originally named made default. The court entered a decree finding "that the plaintiff is not entitled to the relief prayed for" and ordered "the temporary restraining order . . . dissolved, and plaintiff's bill . . . dismissed." Plaintiff has appealed.

Plaintiff's evidence showed that plaintiff, his wife, and Repple were sureties on an appeal bond, approved September 21, 1932, in a case appealed to this court. This appeal was dismissed here May 17, 1935, "for failure to comply with the rules," and this court's mandate filed June 1, 1935. Suit on the appeal bond was brought and *lis pendens* filed against the land involved herein, as well as land of plaintiff, June 28, 1935. Judgment was entered October 22, 1935, for $8215.50 against all sureties. Plaintiff paid this judgment and on April 15, 1936, obtained judgment against Repple for $2832.35 for his proportionate liability on the bond. Execution was issued, and thereafter levy was made on the land herein involved. It was sold September 11, 1936, to plaintiff for $2000 and he received a sheriff's deed for it. Repple had owned one of the properties involved for ten years prior to the time he qualified on the appeal bond and bought the other about four years before for $8700. He improved both properties at that time at a cost of around $10,000. They were double brick houses with two stories, ten rooms and five garages. He owned and lived in another house between these two. There was evidence tending to show that Repple had no other property in Missouri; and that these trust deeds with prior encumbrances practically equaled the present value of the properties.

Plaintiff testified, and had corroborating evidence of two witnesses to so show, that Repple came to see him at his tavern in April, 1935, and that they had the following conversations: "He says: 'We are going to lose that case in the Supreme Court,' and he says, 'We are liable for the bond.' He says, 'I am going to put some phony mortgages on my property so they can't touch it.' . . . . I told him no, I wouldn't put none on mine. . . . . He came down a couple of days afterward with another gentleman, and he says, 'We are coming up to the house and sign this up,' and he says, 'You might as well come along and do that yourself and save your property.' So I said, 'No, I won't do it,' and then he came down a couple of days afterward and he says, 'Mine is all fixed up,' he says, 'They ain't collecting from me.' " Repple did make two trust deeds dated April 2, 1935, each covering one of his houses and each securing a $3000 note due in three years with six semi-annual interest notes for $90 each. Each of these notes and trust deeds were made to a daughter of Repple. Repple did not appear or testify, but the real estate broker who prepared these notes and trust deeds for him said that they were made to Repple's daughters as straw parties. He said that Repple first wanted to have them made to the real estate broker's secretary but that he told him he did not want that and suggested, " 'You have got two daughters here,' to make them out each one in their name." From this real estate broker's testimony it appears that these trust deeds were second mortgages. He also testified that Heldmann brought him the trust deeds in July or August, 1936, and that he advised him to get an attorney and foreclose. He said: "He came in a week after and told me to go ahead and foreclose. I told him he needed about a hundred dollars, and he said he didn't have a hundred, to go ahead and foreclose and I would get the money later on. So he did bring the deeds of trust in that morning." (The foreclosure sale was advertised for September 26, 1936, and enjoined when this suit was commenced.) "Q. And after that restraining order was served on Mr. Roseman what did you do then? A. Well, I called this fellow Spellbrink. I knew he was Repple's lawyer, and I asked him what the hell it was all about." He further testified that he had paid $104 for the foreclosure notice but had never collected it from Heldmann.

Heldmann was a woodworker at a planing mill. He was a widower sixty-eight years old. He testified that he bought the two $3000 notes and trust deeds for $4500 on May 15, 1935. He and Repple had been friends for twenty years. He had bank books to show that he had savings accounts in three banks and that on May 13, 1935, he withdrew a total of $3655 as follows: From Northwestern Bank $1130, leaving a balance of $10.82; from Bremen Bank, $1025, leaving a balance of $1.36; from Mercantile Commerce Bank $1500,

leaving a balance of 98 cents. He said that he walked alone from one bank to another to make these withdrawals. However, the records of the Northwestern Bank showed that (on this morning) he entered their safety deposit vault where he had a box and that someone accompanied him there. He said he then also had $1000 in currency at his home.

Heldmann testified concerning this transaction as follows:

"It was the latter part of April and Mr. Repple came to me and, says, 'Now, I will tell you, I need some money and need it badly,' . . . I says, 'Well, I will study it over,' and it was about two weeks later when he came to my house again and he says, 'Well, how about it, Julius?' 'Well,' I says, 'I will study it over and I will let you know.' So, that was on a Saturday evening when he come to see me. That was the 11th and then on a Monday, the 13th, I went to the bank and drew out the money. He told me that he had two deeds of trust he was going to sell them to me for $4500. . . . I studied it over—I had from Saturday night, Sunday and Monday morning I was ready to do business with him and I thought being that he was going—probably was in need of that money and in the meanwhile that he would redeem everything. . . . Q. Now, where did you keep this money, this $3655.00, from Monday until Wednesday night? A. In my house. . . . Then the 15th, in the evening, I went over to his house and I says, 'Harry, I got the money for you.' Q. Why did you keep it three days—pretty near, say— when you knew you were going to buy these deeds of trust, you say? A. I don't know. . . . Q. Did he tell you whether they were first or seconds? A. He didn't tell me. . . . Q. Did you look to see how much the notes were for that night? A. No, I didn't. Q. You didn't know whether they were for a hundred dollars or three thousand dollars each, did you? A. No. Q. Did you know who signed the notes? A. No, sir. Q. Did you know who they were made payable to? A. No, sir. Q. Did you notice whether they were endorsed or not? A. I don't know. . . . Q. Did you know whether they had ever been recorded or not when you bought them? A. I didn't know that. . . . Q. Did you know at that time whether there were any taxes due on this property? A. No, sir."

Later in his cross-examination Heldmann admitted that, on Saturday, May 11, 1935, he was involved in an automobile accident and was placed under arrest and was afterwards sued for damages. He then testified: "Q. Now, you went down to these several banks Monday morning as early as you could get in them to draw out that money, didn't you? A. Yes. Q. And for the purpose of defeating this damage suit, wasn't it? A. Yes." He also then testified that his son drove him that morning in an automobile to all of these banks.

He further stated that when the first interest notes matured he went to Repple to collect but was told that he had turned the property over to a brother in Iowa and did nothing further about collecting until the second interest notes came due. He also testified thus: "Q. Then you didn't go to him on this first note at all, did you? A. Well, I don't remember."

Heldmann was not present at the foreclosure sale and testified as follows concerning it and subsequent developments:

"Q. Well, you have seen this advertisement here, haven't you? The foreclosure advertisement? A. The first time that I heard you gentlemen talk about it. Q. When, this morning? A. Yes. Q. Did you pay for any advertisement at all? A. No. sir. Q. Did anybody send you any bills for an ad? A. Not to this day, yet. Q. Did you know that there was an injunction granted by this court prohibiting the foreclosure under these deeds of trust? A. I don't know nothing about that. . . . Q. How did you find out about this lawsuit? A. In my behalf? Q. Yes. Didn't you come in and ask the court to let you come into this case? A. I did not— . . . Q. Who told you that there was a case like this pending in this court? A. There was never told me anything. Q. Nobody at all? A. No. Q. Were you at the sale on the 26th day of September, 1936? A. No. Q. Did you have anyone there? A. No, sir. Q. The truth of the matter is you didn't know anything about that sale and these transactions because you didn't own these deeds of trust; isn't that a fact? A. I didn't know nothing about it then. Q. I say, that is the reason, isn't it? You got these deeds of trust after this whole thing came up, didn't you? A. I don't know whether I got them after or before. I didn't know nothing about what he had on hand and what you had on hand. . . . Q. Now, isn't it true that you are doing—you are doing all you are doing now, you are doing for Harry Repple? A. To some extent; yes, sir. Q. And you are trying to repay him for the kindness he showed you when he signed your son's bond, isn't that true? A. I didn't get that right, Mr. Coffman. Q. I say, aren't you doing this for him because of your friendship for him? A. Yes, sir. The Court: He says to some extent. Q. What is the extent you are doing it for him? A. Sir? Q. To what extent are you doing this for him? A. For no compensation whatever. Q. You said to some extent. What did you mean by that? A. The friendship of him. Q. I know, but what did you mean by that? A. Doing him a favor. Q. How are you doing him a favor? A. Well, he asked me for a loan of the money and to make things even look better, why, he handed me these deeds. I bought them, of course. Q. To make things look better? Did you actually pay him the money for those deeds? A. Yes, sir. Q.

Did you give them back to him? A. He never gave anything back to me."

This being an equity case, it is considered here *de novo* on appeal with authority to pass upon the weight of the evidence, although we usually defer to findings of the chancellor depending upon credibility of witnesses who appeared before him. [Shaw v. Butler (Mo.), 78 S. W. (2d) 420, and cases cited.] Here the decree contains no specific findings on fact issues, but only finds that plaintiff is entitled to no relief and dismisses his bill, so that we are not definitely advised as to the court's view of any fact issues. In spite of our inclination and desire to follow the rule of deference, whenever the result seems reasonable upon review of the evidence, we cannot come to the conclusion that the result reached by the trial court herein should be permitted to stand. This court, when it has found the weight of the evidence to be overwhelmingly against the decree, has reversed the trial court, made its own findings, and determined what decree should be entered. [Shaw v. Butler, supra; Farmers & Traders Bank v. Kendrick, 341 Mo. 571, 108 S. W. (2d) 62; Godchaux Sugars v. Quinn (Mo.), 95 S. W. (2d) 82; Oldham v. Wright, 337 Mo. 170, 85 S. W. (2d) 483; George v. Surkamp, 336 Mo. 1, 76 S. W. (2d) 368; Cordia v. Richards, 329 Mo. 1166, 48 S. W. (2d) 878; Friedel v. Bailey, 329 Mo. 22, 44 S. W. (2d) 9; Vannoy v. Duvall Trust Co. (Mo.), 29 S. W. (2d) 692; Farmers Bank v. Handly, 320 Mo. 754, 9 S. W. (2d) 880.] We have carefully read and reread the evidence before us, much of which we have set out in full in our statement, and think it is our duty to do so in this case.

In the first place, we must start with these evident facts, that Repple did make these trust deeds to straw parties without consideration; that he merely obtained the endorsements of these straw parties and retained possession of the papers; and that his purpose in doing so was to put his property beyond the reach of his judgment creditors. These actually were "phony mortgages" made to defraud his creditors, and Repple did not even take the witness stand to deny it. Moreover, the alleged innocent purchaser finally admitted that he actually drew his money from banks (and only accounted for $3655 in this way) not for the purpose of purchasing these mortgages (as he first definitely stated) but to conceal it for the purpose of defeating the collection of damages from him. Thus we find that both parties (friends of twenty years standing) to the transaction, which we are asked to uphold as a valid sale of negotiable instruments to a *bona fide* purchaser for value, were seeking to find a means of concealing their property from creditors before they made it. The most reasonable inference seems to be that they have attempted to fit together two bad trans-

actions with the hope that they could make this look like one good one. Furthermore, this alleged innocent purchaser did not purchase from the payees of the notes or from a subsequent endorser, but bought directly from the maker of the notes himself, and (according to his own claim) for three-fourths of the amount his vendor thereby promised to pay; yet he says he was "doing him a favor . . . for no compensation whatever." Finally, his explanation is so unreasonable in the light of all the facts and circumstances that it can have very little weight or probative value.

To uphold this transaction, we must believe that Heldmann, after carefully saving small amounts from the wages of his labor over many years, drew out of banks practically all his life's savings after leaving them there throughout the depression when many banks were failing (at a time when we judicially know that deposits had been guaranteed by the United States government) to buy mortgages without knowing who signed them, whether they had been recorded, what property they described, or whether there were prior liens, and without even looking at them to see what he was getting for his money; that a man who had invested his life's savings in two mortgages would show no concern about interest defaults; that he would do nothing to assert his claim when the property was being sold under execution; that he would after repeated default turn the foreclosure over to representatives of the debtor and not even attend the sale; and that he would not even know the sale had been enjoined or that the suit was pending to set aside the mortgages (he claimed to own) to which he had been made a party by intervention. It is possible to believe that he would make a loan to an old friend, "doing him a favor . . . for no compensation whatever," but, if he did, it also seems reasonable that this mortgage deal had nothing to do with it except "to make things even look better" for his friend who wanted things to look to his creditors as though their judgments were uncollectible. Almost every badge of fraud, recognized by the authorities, appears upon this transaction. [See Castorina v. Herrmann, 340 Mo. 1026, 104 S. W. (2d) 297; Hendrix v. Goldman (Mo.), 92 S. W. (2d) 733.] Therefore, this case seems to us to be within the rule of George v. Surkamp, supra, namely: "That when it was shown that the title of (Repple, the maker of these notes) . . . was so defective, when he acquired (them) under such circumstances as amounted to fraud, then the burden of evidence was on (Heldmann claiming under him) to show that his purchase of the (notes) was in good faith and for value and without any notice of the fraudulent character of (Repple's) acquisition and holding of the (notes);" and we cannot hold that his evidence sustained this burden.

Moreover, even if Heldmann did pay money to Repple as

he claims, he was attempting to aid him in concealing his entire interest in this property, which from the evidence it seems reasonable to believe was substantially more than the amount he claims to have paid. This court has said that, in such a situation, "when a creditor by fraud will attempt to defeat the claims of other creditors, there is no hardship in postponing his demand although a just one to those which he is endeavoring to defeat." [Hendrix v. Goldman (Mo.), 92 S. W. (2d) 733; Voelpel v. Wuensche (Mo.), 74 S. W. (2d) 14; Emlet v. Gillis (Mo.), 63 S. W. (2d) 12; Farmers Bank v. Handly, 320 Mo. 754, 9 S. W. (2d) 880; First National Bank v. Fry, 216 Mo. 24, 115 S. W. 439.] This is a severe rule, not to be technically applied, and its limitations are stated in Peoples Bank v. Jones, 338 Mo. 1048, 93 S. W. (2d) 903. But here, by Heldmann's own statement he was doing Repple a favor for no compensation whatever. What else could this mean except that at least $1500 of the consideration of the trust deeds was fictitious? We hold that in this case, the equities are so strongly in favor of plaintiff that it is a proper situation for application of the rule above stated.

One of defendants' defenses was "that the plaintiff has no right of action herein for the reason that plaintiff obtained no title whatsoever to the property described in plaintiff's petition herein by the sale held by the Sheriff of the City of St. Louis, Missouri, on the 11th day of September, 1936, for the reason that the Sheriff could, on that day, sell only the right, title and interest of the defendant Harry Repple in said property, and the defendant Harry Repple on said day had no right, title or interest in said property." No conveyance by Repple, other than the trust deeds attacked, was shown. A similar contention was made in Hendrix v. Goldman, supra, and was thus ruled: "The sheriff's deed was in evidence, and the regularity of the proceedings, upon which it is based, are now settled by the recitals of the sheriff's deed, which are conclusive here in the absence of any showing to the contrary. [Secs. 1211-1214, R. S. 1929 (Mo. Stat. Ann., secs. 1211-1214, pp. 1449, 1451, 1452); Williams v. Maxwell (Mo.), 82 S. W. (2d) 270.] We must therefore consider that this established plaintiff's title to the land, subject only to the deed of trust, and that (he) had the right to have its validity against (his) title determined." It is also well settled "that, when land has been fraudulently conveyed, the judgment creditor may resort to equity in the first instance, to have the conveyance set aside so that it may be sold under the lien thereof free from any doubt due to such conveyance; or he may disregard the conveyance, make a levy and sale to enforce such lien, and then sue to cancel the conveyance as a cloud on his title." [Castorina v. Herrmann, 340 Mo. 1026, 104 S. W. (2d) 297, and cases cited;

see, also, 3 Missouri Law Review, 73.] These authorities show the former method to be the better and more approved method, but here the bid of plaintiff, as execution sale purchaser, was a substantial amount, and the sale was not attacked on such grounds in the trial court.

The decree is reversed and the cause remanded with directions to enter a decree declaring the trust deeds void, and declaring title to be in plaintiff as against all parties to this action. *Ferguson, C.,* absent; *Bradley, C.,* concurs.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.