Mercantile-Commerce Bank & Trust Company, a Corporation, v. Kieselhorst Company, a Corporation, Edwin A. Kieselhorst and Wallace W. Kieselhorst, as Trustees for said Kieselhorst Company, Appellants.—No. 37619.—164 S. W. (2d) 342.

Division One, July 1, 1942.

Rehearing Denied, July 28, 1942.

Motion to Transfer to Banc Overruled, September 8, 1942.

*Goodbar, Ferriss & Hall* and *Henry T. Ferriss* for appellants.

34

*Thompson, Mitchell, Thompson & Young, Samuel A. Mitchell, Robert Neill, Jr.,* and *Richard D. Shewmaker* for respondent.

BRADLEY, C.—This is an action to recover the balance due on a note for $62,000, after the sale of the collateral pledged to secure it and a credit of the proceeds thereon. Defendants, in the first count of the answer, admitted the execution of the note by the Kieselhorst Company, and that it was secured by the collateral sold. In a second count, and by way of a counterclaim, defendants sought to set aside the sale of the collateral and to require plaintiff "to return said securities or equivalent securities to the defendants, or to account for the present value thereof, which the defendants state is approximately $175,000; and also to account to the defendants for the accrued dividends and income thereon since said sale; that a further accounting be had as to the amount owing from defendants to plaintiff on said note, which amount, when so ascertained, the defendants offer to pay and to credit on the amounts owing them by the plaintiff; and that, after such accounting, the remainder of said securities, or their value, be returned or paid to these defendants, and that defendants have judgment against the plaintiff for the balance so found to be due, and for all other and general relief." The answer carried the cause to equity, and the trial chancellor rendered judgment against defendants for $17,412.71, which included balance due on the note, interest and attorney's fee for which the note provided, and found against defendants on the counterclaim. Defendants appealed.

The suit was filed June 25, 1932, five days after the sale of the collateral. The trial commenced December 4, and ended December 7, 1939. The court took the case under advisement and rendered judgment June 14, 1941. The suit was commenced against the Kieselhorst Company, a corporation, the maker of the note, but the corporation's charter was forfeited and the corporation dissolved January 1, 1934, under Secs. 5085-5091, R. S. 1939. Defendants, Edwin A. and Wallace W. Kieselhorst, father and son, are the surviving directors of the corporation, and under Sec. 5094, R. S. 1939, upon dissolution, became trustees of its assets, and were substituted as defendants March 20, 1939, and filed answer same day. The judgment was against the substituted defendants as such trustees "and not in their individual capacities."

The Kieselhorst Piano Company was incorporated October 10, 1898, and under this name engaged in the sale of pianos and other musical instruments until 1926, when the name was changed to Kieselhorst Company, hereinafter referred to as the Company. The Company

discontinued active business "as a piano and musical instrument house" July 19, 1930, but thereafter maintained an office in the Railway Exchange Building, St. Louis, and made some sales from its warehouse. For many years the Company had been a customer of the National Bank of Commerce, and after the consolidation of this bank and the Mercantile Trust Company, continued as a customer of the consolidated bank and trust company, plaintiff in this cause. April 4, 1929, prior to the consolidation, and at the request of the elder Kieselhorst, the bank granted the Company "a line of $150,000." That is, granted the Company the privilege of borrowing up to $150,000 without putting up collateral. Three weeks later, and upon request, "the line" was increased to $200,000. Shortly after "the line" for $200,000 was given, the Company borrowed $185,000 from the bank. The interest was paid and payments on the principal were made at intervals, and the note was renewed ▆▆▆ from time to time. In 1931, collateral was required. By October 16, 1931, the principal had been reduced to $67,500, and on that date the Company executed its note to plaintiff for $67,500. This note was secured by stocks pledged, which cost the Company in excess of $400,000. April 15, 1932, the Company executed to plaintiff the note, set out, infra, for $62,000, and this note was secured by the same collateral pledged to secure the $67,500 note, together with additional stocks.

The $62,000 note was the last one given. June 20, 1932, plaintiff foreclosed on the collateral. The listed stocks pledged as collateral were sold at stock exchanges in New York, Chicago, and St. Louis, at noon on date mentioned. The unlisted stocks, pledged to secure the note, were sold at public sale on the same day, June 20, 1932, at the "east front door" of the court house in St. Louis. The listed stocks were sold at the market value, about $51,000 on day of sale, and the unlisted were sold for $2537.50. Expenses of sales were deducted, before crediting the proceeds on the note. Plaintiff, for the most part, was the purchaser of the pledged stocks.

Omitting the collateral agreement, the note of April 15, 1932, was as follows:

"*$62000.00*          St. Louis, Mo., *April 15th,* 1932.

"On demand after date, and if no demand is made, then on the *15th* day of *October,* 1932, we promise to pay to the order of the Mercantile-Commerce Bank and Trust Company, at its office in the
City of St. Louis,
the sum of *sixty two thousand* ...........................:.....dollars, for value, with interest from date at the rate of 5½ per cent per annum, payable monthly until maturity, and at the rate of eight per cent per annum after maturity until paid. Demand for payment, protest and notice of dishonor are hereby waived by parties, whether as signers, endorsers, guarantors, or in any other capacity, and this note may be extended from time to time without notice and without

releasing any of said parties. If this note be not paid at maturity, the parties hereto agree to pay, in addition, all costs of collection and ten per cent attorney's fees.

"Kieselhorst Co.

"E. Kieselhorst, Pres.

"Due *October 15th, 1932.*"

Parts we have italicized are in the handwriting of defendant, Edwin A. Kieselhorst, and the remainder, except the interest rate and signature, is printed form.

The pertinent part of the collateral agreement, a part of the note, without indications of omission, follows: "Should any of said collateral securities in the judgment of the trust company depreciate in value, the undersigned agrees to forthwith, on demand, deposit with said trust company, additional collateral securities satisfactory to said trust company. In the event said additional collateral securities shall not be deposited as hereinabove provided, within 24 hours after demand, then said trust company may elect to sell said collateral securities at private or public sale at any exchange, without advertisement, upon such terms as said trust company may fix and determine; and said trust company may purchase at any such sale. Out of the proceeds of any such sale said trust company, after the payment of all costs and expenses for making such sale, shall first pay off and satisfy said note in full, and the residue, if any, shall be paid to the undersigned (the Company), and in case of any deficiency the undersigned agrees promptly to pay the same."

In the counterclaim the trustees allege that it had been the custom to renew, from time to time, the note owed plaintiff, and that when the note matured April 15, 1932, it was the desire of the Company to renew for six months, and that on that date the Company executed and delivered to plaintiff the $62,000 note; that between April 15, and April 19, 1932, "various negotiations took place between the plaintiff and the said Company looking toward the renewal of said loan and the acceptance of said new note; that plaintiff demanded that said Company deposit with it more securities as collateral for said loan in addition to those already held by plaintiff at that time (and) through its authorized agent stated and represented to said Company that if a certain agreed list of additional collateral were delivered and pledged to the plaintiff, together with that already pledged, it would renew the loan; and further represented that it, the plaintiff, was satisfied with the total amount of collateral thus to be pledged as security for said loan and that its intention was to ask for no further collateral during the period of renewal, and that its intention was not to demand the payment of said note or any part thereof prior to October 15, 1932, and that it would not do so."

Defendants further alleged that the Company "relied upon the foregoing statements", and on April 19, 1932, delivered to

plaintiff as additional collateral to said note "all the remaining se-
curities of any value which the said Company then owned, as plaintiff
well knew"; that the additional securities "were of very substantial
value, having cost said Company over $50,000"; that "plaintiff ac-
cepted said additional securities and the new note for $62,000, re-
taining also the collateral already in its possession as security for the
new note, and returned" the note due April 15, 1932, "marked paid
and cancelled."

It is further alleged that the "representations so made to said
Company by plaintiff were false and untrue, and were made for the
purpose of deceiving and misleading said Company and inducing it
to deposit such additional securities as part of the collateral for
said loan and to repledge the securities already in the plaintiff's pos-
session; that in truth and in fact the plaintiff's intentions at the time
of apparently renewing said note for six months were to get from said
Company all of the additional collateral which it then had left, and
thereafter promptly to demand even more collateral or payment of the
note, or part of it, and then, if it failed to receive payment or addi-
tional collateral, to declare a default and sell out all of the said Com-
pany's securities then in the plaintiff's possession, which it soon did."

Defendants allege that in two days "after the renewal of the loan
and the acceptance of the new collateral, on April 19, 1932", plain-
tiff, "pursuant to said fraudulent" intent made demands for $15,000
additional collateral, although plaintiff knew that the Company had
no additional collateral, and that when the Company failed to pledge
the $15,000 additional collateral demanded, plaintiff wrongfully de-
manded payment of the entire note and declared a default under the
note and pledge.

Defendants alleged that as to the pledged collateral, plaintiff was
trustee for the Company and "owed it the utmost good faith" to
preserve the same, and not to sell unless for a "fair and reasonable
value", and that notwithstanding such relation and duty plaintiff
chose to demand full payment" and to sell "at a time when all
security markets in this country were in an abnormal and demoralized
condition, due to the existence of the greatest financial and economic
depression in the history of this country, and when prices obtainable
on such exchanges did not represent the fair and reasonable value of
such securities"; that the amount for which the collateral was sold
was grossly inadequate; and that the sale, in the situation, was "un-
conscionable and a fraud upon" the Company, and a breach of plain-
tiff's duties as pledgee, and resulted "in wiping out" the Company's
entire investment in the pledged securities.

In the reply plaintiff denies specifically the allegations in the
counterclaim, and alleged that the Company's note was each time
renewed "in the light of the then existing facts." It is admitted by
plaintiff that "on or about April 15, 1932" the Company "executed

and delivered'' the $62,000 note, but it is alleged, in effect, that the note was *accepted* only according to the tenor of both the note and the pledge agreement, and was not accepted in the sense that plaintiff was bound to carry the loan till October 15, 1932, regardless of depreciation of the market value of the pledged collateral.

April 6, 1932, A. W. Thias, plaintiff's vice president, wrote defendant, Edwin A. Kieselhorst, stating that because of ''depreciation in the value of the collateral pledged'' to secure the note coming due April 15, 1932, a payment on the principal and additional collateral would be required. April 7, 1932, Mr. Kieselhorst, in a letter to Thias, remarked on the condition of the stock market, on what he thought bankers should do in the situation then obtaining, etc., and said ''as our note matures April 15th, only a few days now, we respectfully request holding the matter in abeyance until that date. Then we will pay the $436.03 interest and as much as possible off the principal, and respectfully ask you to renew the balance then due for six months. Thus the old goose may continue laying golden eggs for you.'' On April 15, 1932; Mr. Kieselhorst wrote Thias, and sent the letter, the interest check, and the $62,000 note by his son, defendant, Wallace W. Kieselhorst. In the letter he said: ''Here is the $436.05 on the old note; also renewal note for sixty-two thousand balance with interest space open. Kindly favor us with a low rate mutually fair under existing conditions. You always have treated us nicely.'' The son testified: ''I brought over the renewal note and interest check and talked with him (Thias) for awhile. He said he was chiefly interested in talking with father. He knew I hadn't been active, wasn't exactly familiar with the task.''

April 16, 1932, Thias called on defendants at their office in the Railway Exchange Building. Of Wallace W. Kieselhorst's visit to Thias on April 15th, and of Thias' call on April 16th, defendants, in the brief, say: ''When this note and letter were presented to vice president Thias of the bank, Mr. Thias said the bank would have to have more collateral. Later that day, Wallace Kieselhorst returned to the bank with a list of all the remaining securities which the Kieselhorst Company had and handed same to Mr. Thias, to be checked by the bank. The next day, April 16th, Saturday, Mr. Thias, vice president of the plaintiff bank, went to the office of the Kieselhorst Company and gave back to Mr. Kieselhorst the list of new securities, some of which had been checked in red pencil, indicating its acceptability to the bank (the balance was considered worthless), and an important conversation took place in regard to the new loan, as to which Mr. Kieselhorst and his son, Wallace, on the one hand, and Mr. Thias on the other, give different versions. Suffice at this point to say that appellants claim that in that conversation Mr. Thias stated that the bank was satisfied with the additional collateral, which had been checked on the list, and would renew the loan for

six months and would not demand additional collateral or payments during such six months; and that Mr. Kieselhorst (the elder) relied on that statement and promise and put up the additional collateral and repledged the old collateral in the belief that he had a definite six months loan. Mr. Thias denied that he made such statement or agreement.

"In any event, as a result of that conversation, Mr. Kieselhorst on the following Tuesday, April 19th, took over to the bank and delivered to Mr. Thias all of the additional securities which had been checked by the bank (and which had cost the Kieselhorst Company over $50,000), and Mr. Thias accepted this additional collateral, gave it to the note teller, placed his initials, 'A. W. T.' on the new note, meaning thereby to indicate his approval of same, and gave back to Mr. Kieselhorst the old note dated October 15, 1931. . . . Just two days after the new loan was made, namely, on April 21st, Mr. Thias, vice president of plaintiff bank, called again on Mr. Kieselhorst (the elder) in the latter's office and abruptly demanded a cash payment of $15,000 on the note or the deposit of $20,000 additional collateral. . . . Following such demand and refusal on April 21st, there was a lull for a little over a month. During this time the stock market declined further. The bank did nothing further until its letter of May 31st to Mr. Kieselhorst, in which Mr. Thias wrote as follows:

" 'We are writing to confirm our oral request to you, Mr. Kieselhorst, made some time ago for additional security under the collateral note of the Kieselhorst Company to the order of the undersigned (plaintiff) dated April 15th, 1932, in the amount of $62,000.00. Under the terms of this note you have agreed in the event that the collateral securities depreciate in value, to forthwith on demand deposit with us additional securities satisfactory to us. We demand that you deposit with us on or before Monday, June 6th, 1932, additional collateral of the market value of $20,000.00 or else make a cash payment of $16,000.00, reducing the amount of the note by that amount. In the event that such payment is not made, or such collateral is not deposited by Monday, June 6th, we shall demand payment of the note on the following day, and if the same is not paid, shall sell the collateral.' "

The questions are: (1) Was the foreclosure on the collateral valid? and (2) Could plaintiff maintain an action for the balance due, after the sale of the collateral, prior to October 15, 1932?

The cause is in equity and we consider it de novo. Peikert v. Repple et al., 342 Mo. 274, 114 S. W. (2d) 999, l. c. 1002, but it is the settled law that the finding below, on conflicting evidence, in an equity case will not be disturbed unless clearly erroneous. Fessler et al. v. Fessler, 332 Mo. 655, 60 S. W. (2d) 17, l. c. 23.

Was the foreclosure on the collateral valid? As appears, supra, defendants contend that plaintiff's vice president, Thias, stated

that plaintiff was satisfied with the additional collateral and would "renew the loan for six months and would not demand additional collateral or payments during such six months", and that defendants "relied on that statement" and "put up the additional collateral and repledged the old collateral in the belief" that defendants "had a definite six months loan." It also appears, supra, that defendants concede that Mr. Thias denied making the alleged statement and agreement attributed to him. Plaintiff argues that even ▮▮▮ though Thias made such statement and agreement as claimed by defendants, that such were promissory in nature and not actionable. Also, it is argued that the evidence that plaintiff would not demand a payment or call for additional collateral prior to October 15, 1932, was incompetent under the rule that parol evidence is not admissible to vary the terms of a written contract (the pledge agreement). On the subject of promissory statements, see Reed v. Cooke et al., 331 Mo. 507, 55 S. W. (2d) 275, l. c. 278; Grand Lodge of United Brothers, etc., v. Massachusetts Bonding & Ins. Co. et al., 324 Mo. 938, 25 S. W. (2d) 783, l. c. 787. However, there is an exception to the rule of promissory representations which exception is to the effect that "when it appears that a representation is made which is known to be false at the time it is made and the person to whom it is made relies upon it and is deceived thereby to his injury, an action lies against the party making it." Jeck v. O'Meara et al., 343 Mo. 559, 122 S. W. (2d) 897, l. c. 902, and cases there cited. But we do not think the exception is applicable to the present situation. The evidence is admittedly conflicting as to whether Thias made the promise that plaintiff would not demand a payment or call for additional collateral prior to October 15, 1932, and we cannot say that the finding below was clearly erroneous, which finding would be necessary, where the evidence is conflicting. Also, it is quite clear that any parol promise not to demand additional collateral, regardless of depreciation of the pledged stock, prior to October 15, 1932, was contrary to the written pledge agreement.

Defendants concede that the market value of the collateral had substantially declined between April 19, 1932, when the additional collateral was taken to the bank, and May 31, 1932, when Thias, in letter, demanded a payment of $16,000 or a deposit of $20,000 additional collateral. In the situation, it is quite clear that we would not be justified in holding the foreclosure of the collateral invalid on the theory that such was contrary to an oral promise on the part of plaintiff not to demand additional collateral.

▮▮▮ "In making the sale (of pledged property) the pledgee is regarded as acting as a trustee, or agent of the pledgor, and accordingly must act fairly and in good faith, and with a reasonable degree of skill and diligence, to secure a fair price for the property, and to conserve the interests of the pledgor and of other persons concerned,

as well as to secure and protect the pledgee's own rights or interests. These rules apply although the pledgee is authorized to sell without appraisement, advertisement or notice, or to purchase for himself.'' 49 C. J., p. 1004, Sec. 262.' See also Continental & Commercial Nat. Bank v. Ricker et al., 330 Mo. 75, 49 S. W. (2d) 20, l. c. 23. Defendants contend that independent of the breach of any promise to carry the $62,000 note till October 15, 1932, without demand for additional collateral, plaintiff, in selling the collateral, breached its duty as pledgee, and that for that reason the sale of the collateral was invalid. In the brief defendants say: ''The foreclosure sale on June 20, 1932, under the abnormal financial conditions then prevailing, represented such poor judgment, such an unsound discretion, as to amount to an abuse of the bank's trust position as pledgee and a sacrifice of this valuable collateral at absurdly low prices. For this reason alone, if no other existed, the sale should be set aside by a court of equity.''

It will be noted that the pledge agreement provides that if any of the collateral *depreciate in value,* then plaintiff could demand additional collateral, etc. Defendants point out that the pledge agreement does not say that foreclosure could be made because of a *decline in market value* of the collateral. Defendants say that *depreciate in value* means a depreciation in *real value* ''as distinguished from a mere decline in market quotations.'' Plaintiff made no investigation of the companies whose stocks were pledged, and it is conceded that the foreclosure was based on a decline in market values.

It is, in effect, conceded that in 1932, the whole country was in the grip of a devasting depression. And we judicially know that such was the case. Krueger et ux. v. Licklider et al. (Mo. Sup.), 76 S. W. (2d) 113, l. c. 117; Saline County et al. v. Thorp et al., 337 Mo. 1140, 88 S. W. (2d) 183, l. c. 185; State ex rel. St. Paul & K. C. Shortline R. Co. v. Public Service Commission, 339 Mo. 641, 98 S. W. (2d) 699, l. c. 703. Defendants showed by the chief bank examiner in the 8th federal reserve district that about January 1, 1932, the U. S. Comptroller of the Currency issued instructions to all national bank examiners to the effect that the intrinsic worth of bonds held by national banks, instead ▇▇▇ of market quotations, would be the basis of valuation. And it appears that a similar rule of valuation was adopted by State Insurance Departments in December, 1931. However, it appears that the Comptroller of the Currency explained that ''the ruling may not be described as of a general character, but represents more a policy of liberality in ·giving consideration to questions of bank. solvency.'' Dr. James R. Jackson, professor of finance, St. Louis University, as an expert, testified to the effect that the market quotations of the collateral foreclosed on the day of foreclosure did not fairly represent ''the value of those stocks.''

As things washed out, the market value of the pledged collateral

increased greatly from what may be termed the bottom of the trough, as to these stocks, on June 20, 1932, when the foreclosure sale was had. As appears, supra, the market value of the pledged collateral on day of sale, that was listed on the market, was about $51,000. Subsequent market values of this collateral, as appears in the record, follows: August 20, 1932, $80,867.92; October 15, 1932, $77,663.13; February 1, 1937, $353,230.68; November 26, 1939, $219,022.17.

It must be remembered that plaintiff bank, in dealing with the pledged collateral, had more to think about than its own pocket. It was not only a *trustee* for the pledgor as to the collateral, but it was also the *debtor* of its depositors whose money, in practical effect, it loaned to the Company.

In Darien Bank et al. v. Varner et al., 175 Ga. 193, 165 S. E. 82, l. c. 83, it is said: "An injunction should not be granted to restrain the sale of collateral deposited with a creditor to secure payment of a note which is past due, merely because the collateral, due to the depression of the times, will not bring its full value, or because the lender, at the time that he accepted the note, orally agreed to extend the time of payment thereof for as much as one year, where there is in the petition no allegation that the note was obtained by fraud, or that the defendant is insolvent." And in Hudgens v. Chamberlain, 161 Cal. 710, 120 Pac. 422, l. c. 424, is this: "After default, he (pledgee) has a lawful right to sell them (pledged collateral) at any time, and as long as the sale is made at market prices the mere fact that they are sold in an unfavorable condition of the market, and consequently bring a low price, affords no ground for complaint on the part of the pledgor. The pledgee is under no obligation to take any chances on the market, or wait for a more favorable one than exists when he elects to sell. If any limitation was to be placed upon the condition of the market at which the sales of the pledged property were to be made after default, the pledgor should have provided for this in his contract. Having failed to do so, when the lawful right to sell has accrued, the pledgee may dispose of the pledges at market rates, no matter what the condition of the market may be; nor will it be of any moment that by selling the stock on a depressed market he is afforded an opportunity of purchasing the property at the rates then happening to prevail, and which may be the result only of a temporary depression of the market."

And in Atlantic Nat. Bank of Boston v. Korrick, 29 Ariz. 468, 242 Pac. 1009, l. c. 1011, the court said: "That there existed between the parties a trust relation, and that pledgee in exercising the power of sale owed a duty to the defendants to act in good faith, cannot be questioned. 'But where the pledgee makes the sale in the manner provided by law, and in accordance with the conditions of the contract, and it is not shown that he did, or caused to be done, anything for the purpose of preventing a fair sale, the pledgor has no right to complain. Under such circumstances the pledgee may take the

market as he finds it and exercise his power of sale accordingly.' Williams v. Parker, 30 Cal. App. 71, 157 Pac. 550.'' See also, Whitman et al. v. Boston Terminal Refrigerating Co. et al., 233 Mass. 386, 124 N. E. 43, l. c. 44; Atkinson v. Bank of Manhattan Trust Co. (7th Cir.), 69 Fed. (2d) 735.

It cannot be said that the pledged collateral had not *depreciated in value* when plaintiff demanded additional collateral, and when payment of the note was demanded, and when the collateral was sold June 20, 1932. In the situation and under the provisions of the collateral agreement and without regard as to whether the note was due on demand after date, we rule that the sale of the collateral was valid.

Could plaintiff maintain an action for the balance due after the sale of the collateral, prior to October 15, 1932? As appears, supra, defendant, Edwin A. Kieselhorst, with pen, wrote into the note the parts we italicize, and among these were *15th, October,* and *2* in the language ''on demand after date, and if no demand is made, then on the 15th day of October, 1932'', and he wrote *October 15th, 1932* after the printed word *due* in the lower left corner. Defendants contend that under Sec. 3033, R. S. 1939, the pen written *October 15th, 1932* prevails over the printed *on demand after date,* and that the note could in no contingency be due prior to October 15, 1932. Plaintiff concedes that the pen written *October 15th, 1932,* after the word *due* in the lower left corner, is a part of the note, but denies that it had the effect claimed by defendants. In view of the language of the collateral agreement, conceded to be a part of the note, it will not be necessary to rule the point on the pen written part in the lower left corner.

It will be noted that the collateral agreement provides that ''out of the proceeds of any such sale (of the collateral) said trust company, after the payment of all costs and expenses for making such sale, shall first pay off and satisfy said note in full, and the residue, if any, shall be paid to the undersigned (the Company), and in case of any deficiency the undersigned agrees *promptly* to pay the same'' (italics ours).

In Black v. Epstein, 93 Mo. App. 459, 67 S. W. 736, it is stated that ''the clause below the signatures is a part of the instrument (note) as much as the clause above; the presumption is that it was a contemporaneous agreement and the meaning of the entire instrument is to be gathered from its four corners.'' The cardinal rule of construction of a promissory note ''is to ascertain the intention of the parties.'' 7 Am. Jur., Bills and Notes, Sec. 49. 10 C. J. S., Bills and Notes, Sec. 42, gives the rule of construction as follows:

''Except as otherwise controlled by the specific provisions of the Negotiable Instruments Act, negotiable paper is to be construed like other contracts. The intention of the parties, if legally ascertainable, governs; the intention of the parties is to be determined from

the face of the instrument in the light of the circumstances under which it was given.''

The maker of the present note agreed to *promptly* pay any balance that remained unpaid after a foreclosure on the collateral. Among the definitions of *prompt* (promptly is the adverb) given by Webster's New International Dictionary (2d Ed.) are: ''Ready and quick to act as occasion demands'', ''responding instantly'', ''done or rendered readily or immediately'', ''given without delay or hesitation.'' We think that by the use of the word *promptly* in the collateral agreement the parties to the present note meant that any balance remaining unpaid, after the sale of the collateral, would be immediately due, and we so rule. And, of course, if such balance or deficiency was due, suit for its recovery could be maintained.

The judgment should be affirmed and it is so ordered. *Hyde* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.