**AETNA CASUALTY & SURETY CO., Respondent,**

v.

**TRADERS NATIONAL BANK & TRUST CO., Appellant.**

**No. KCD 26590.**

Missouri Court of Appeals, Kansas City District.

Oct. 7, 1974.

Robert K. Ball, II, Kansas City, for appellant.

Robert M. Kroenert, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, for respondent.

Before DIXON, C. J., and SHANGLER and WASSERSTROM, JJ.

WASSERSTROM, Judge.

Plaintiff Aetna Casualty and Surety Company, the named drawee of a settlement draft on which an endorsement of one of the payees was forged, sues defendant Traders National Bank and Trust Company on the theory that Traders, as a collecting bank, warranted good title to the instrument. Judgment went in favor of Aetna in the amount of the draft plus interest, and Traders appeals.

The facts are not in dispute. Marie Porter was injured in an automobile accident on August 18, 1966. After securing a settlement offer of $1,120 from Aetna through her own efforts, she employed Marshall Lyons, an attorney then practicing in Kansas City, Missouri, to represent her and agreed to pay him one-half of "any amounts collected" over $1,120, or one-third of "any total amount collected," whichever computation was most favorable to Porter.

Lyons commenced negotiation with Aetna's adjuster Bigley, who offered to settle for $2,425, to which Lyons responded that he "would go to his client with that figure and recommend that she take it." A few days later Lyons called Bigley and agreed to the settlement offer. Bigley thereupon mailed a draft No. M–10956408 for the agreed amount to Lyons, together with a separate document of release to be executed by Porter. The draft was made payable to Porter and Lyons jointly.

On August 9, 1968, Lyons deposited the settlement draft in his own account at Traders. The draft bore an endorsement purporting to be that of Porter, as well as an endorsement by Lyons. The draft was forwarded by Traders to Hartford National Bank and Trust Company through whom the draft stated that it would be payable, and Hartford did pay the amount of the draft through the Federal Reserve Bank system to Traders. Promptly thereafter the draft was presented by Hartford to Aetna, who reimbursed Hartford for that payment. For some reason undisclosed on this record, the release sent by Bigley to Lyons was not presented to either Hartford or Aetna at the time the draft was presented. That release was

ultimately received by Aetna, bearing a purported signature by Porter, but that receipt was for some reason delayed until October 28, 1968.

In July, 1969, Porter discovered that Lyons was no longer practicing law and she then contacted Aetna direct about her case. One of the Aetna representatives thereupon came to see her and showed her a photocopy of the $2,425 draft. Porter denied having seen that draft before, having signed it, or having authorized any one to sign it on her behalf. In addition she denies having ever signed or authorized the signing of the August 1968 release. Faced with this situation, Aetna negotiated a new settlement with Porter and paid her the sum of $3,000 on July 24, 1969.

Aetna then sent notice through the Federal Reserve Bank system of the forged endorsement and a letter dated August 25, 1969, was duly delivered to Traders requesting a refund of the $2,425. The parties stipulated that this notification was made within a reasonable time. However, by this time Lyons had withdrawn all funds from his account with Traders and had closed the account. Traders responded to the Aetna demand by denying any liability to Aetna on its endorsement of the draft, and it accordingly refused to make any refund. This suit followed, resulting in judgment for Aetna after trial to the court without a jury.

Traders assigns as error that: 1) Aetna was not entitled to recover on its theory of breach of warranty; 2) Aetna failed to prove that it suffered any damage as a proximate result of any breach of warranty; and 3) that interest was improperly imposed commencing with the date of April 30, 1968.

## I.

### Breach of Warranty

Traders' attack upon Aetna's theory of action is subdivided into three point which must be discussed separately.

## A.

Traders' first attack upon Aetna's right to recover against it rests upon the argument that there is no privity between these parties and that if Aetna has any cause of action at all it must be against its own immediate bank, Hartford. This contention represents the principal issue on this appeal. In support of its position, Traders argues that under the common law the drawer of a negotiable instrument was required to proceed exclusively against the drawee bank and had no right of action direct against prior collecting banks. Traders insists that this common law rule has not been changed by any provision in the Uniform Commercial Code. Aetna, on the other hand, contends that Missouri never adopted the common law rule referred to by Traders; and it argues further that regardless of what the result was at common law, the provisions of the Uniform Commercial Code do give Aetna a cause of action direct against Traders.

A decision of the present case does not require us to enter the thicket of the common law rule debated extensively by the parties. Any decision in that regard would be purely academic, since the result in this case is controlled by the provisions of the Uniform Commercial Code as now contained in RSMo 1969, V.A.M.S., to which all the statutory sections mentioned in this opinion refer.

The scope of the rights and liabilities created by endorsements on drafts, and the persons entitled to the benefits of those endorsements, are stated in § 400.4–207. Paragraph 1 of that section provides that each collecting bank warrants to "the payor bank or other payor" that the collecting bank has good title to the item or is authorized to obtain payment on behalf of one who has good title. The principal argument between the parties in this case comes down to a dispute as to whether Aetna has the position of an "other payor." Aetna says that it does, while Traders in square-toed contradiction says that Aetna does not.

The key to the answer lies in §§ 400.3–120 and 400.4–105(d). The first of those sections is particularly important and states that an instrument "payable through" a bank designates that bank as "a collecting bank." Section 400.4–105(d) then comes into play by identifying a "collecting bank" as meaning any bank handling the item "except the payor bank." The draft here involved provides on its face that it is "payable through Hartford National Bank and Trust Company." Therefore, by the specific and unmistakable terms of the statute, Hartford cannot be the payor of this draft. By process of elimination, Aetna remains the only one left who can be considered as the payor— thus bringing Aetna within the ambit of the term "other payor" as used in Section 400.4–207(1).

Traders does not really deny that this point must be ruled against it if the face of the draft controls. However, it strenuously denies that the terminology in the draft itself controls, arguing that instead the result should be governed by the special course of dealing which existed between Aetna and Hartford. Traders points out that Hartford had agreed with Aetna to pay all Aetna drafts presented for sums under $5,000; a magnetic tape of all such drafts was then forwarded daily by Hartford to Aetna; and after a mechanical checking of that magnetic tape against a master inventory file of draft numbers, Aetna issued a check to Hartford as reimbursement for the drafts so paid. Traders argues that the net effect of this special arrangement was to constitute Hartford as the payor of drafts of less than $5,000, regardless of what appears on the face of the instrument. Traders argues in short that the course of conduct described changed Hartford from a "payable through" bank to a "payor bank."

The difficulty with this argument by Traders is that commercial instruments such as this draft must be governed by the terminology used therein rather than by extraneous factors and actions which are not and cannot be reflected on the face of these instruments. This is particularly true when the paper in question uses terminology which has been defined by a uniform statute, now adopted by 49 states, the District of Columbia and the Virgin Islands, having for its very purpose the fixing of firm and definite rights and obligations throughout the business world. This general concept is reflected in the familiar adage that a negotiable instrument such as the one here constitutes "courier without luggage" and the document is one "whose countenance is its passport." 11 Am.Jur. 2d, Bills and Notes § 62, page 86. This same purpose of accomplishing uniform certainty as to the meaning of and rights under these commercial documents is reflected in the comment under § 400.3–120, that "[t]his section defines the commercial meaning of the words 'payable through'."

Moreover, the courts long before and wholly independent of the Uniform Commercial Code recognized the necessity that commercial paper be interpreted and be given effect solely from the language used on its face and without recourse to extraneous evidence. Koehring v. Muemminghoff, 61 Mo. 403, 407 (1875); Mercantile-Commerce Bank and Trust Co. v. Kieselhorst Co., 350 Mo. 30, 164 S.W.2d 342, 348 (1942); Bradley v. Buffington, 500 S.W. 2d 314, 318 (Mo.App.1973).

Of course, a party to a negotiable instrument or other similar commercial paper may become barred by conduct from relying upon the terms of that writing, on principles of estoppel or waiver. However, neither of those doctrines has any application here. There can be no estoppel, because there was no reliance by Traders on the private agreement or course of conduct between Hartford and Aetna. Traders has all of its operations in Kansas City, Missouri, and had no knowledge whatsoever of the course of dealings between Hartford and Aetna in Hartford, Connecticut, until those facts were disclosed by discovery proceedings in the present case. Since Traders obviously could not rely upon

something they did not even know about, there is no room for estoppel. Peerless Supply Co. Industrial Plumbing & Heating Co., 460 S.W.2d 651 (Mo.1970). Nor is the doctrine of waiver any more applicable. In order for waiver to be invoked, the party itself claimed to have waived must have intentionalIy relinquished a known right by express declaration or by acts so clear, unequivocal and decisive as to be inconsistent with any other explanation. Kroh Brothers Dev. Co. v. State Line Eighty-Nine, Inc., 506 S.W.2d 4, 12 (Mo.App.1974); Bartleman v. Humphrey, 441 S.W.2d 335 (Mo. 1969). No such intentional relinquishment has been shown here of Aetna's right of recourse upon Traders' endorsement.

On the facts of this case and under the applicable statutory provisions, Aetna was an "other payor" entitled to the benefit of Traders' warranty of its good title to draft No. M–10956408.

B.

Traders next argues that Aetna should be barred from recovery under the statutory warranty, because § 400.4–207 makes the right of recovery conditional upon Aetna having paid the draft in good faith. Traders claims that Aetna was not in good faith as that term is defined in § 400.1–201(19), because of the fact that Aetna honored the draft without having concurrently received the release which its adjuster had prepared and requested to be signed by Porter.

■ It is more than a little strange for Traders to now challenge Aetna's good faith in view of the fact that Traders has formally stipulated that Aetna paid the August 1968 draft "without any notice or knowledge that said draft was never received by Marie Porter and never personally endorsed by her." This stipulation virtually establishes good faith on the part of Aetna. At the very least, it removes any question about Aetna having any actual knowledge which could deprive it of good faith status.

■ The farthest extent of Traders' complaint can be only that the delay in delivery of the separate release was enough to put Aetna upon inquiry to discover the facts of the forgery. However, the sufficiency for this purpose of the release not accompanying the draft is not readily apparent. Traders tries to give this significance by claiming that the release was the consideration for the payment and Aetna must have been aware that if the separate document of release was not presented, then it was not getting the consideration for which it had bargained. However, this leaves out of account and totally ignores the fact that the draft itself states on its face that it was "in satisfaction of all claims." Acceptance of the draft by endorsement thereof in and of itself constituted an adequate release. Dean v. Bigelow, 292 S.W. 25 (Mo.1927); Birmingham v. Kansas City Public Service Co., 235 S.W.2d 322 (Mo.1951). Therefore the separate formal release was not necessary to the compromise and settlement and could be treated as a superfluity.

Traders' present argument would be more impressive if there were no reason for the draft arrangement (as opposed to the writing of an ordinary check) other than to insure the presentation of a formal separate release simultaneously with payment of the draft. However, there is another and far more significant reason for insurance companies to use the draft arrangement than that of insuring receipt of a separate release form. The dominant reason for the use of the draft procedure is purely one of economics. A large insurance company such as Aetna may have millions of dollars of drafts outstanding and presented for payment on any business day. For those settlement sums to be paid by ordinary checks, the insurance companies would have to maintain exceedingly large demand deposits in a bank account drawing no interest. There is an obvious reason to use instead the draft device so that the insurance company will only deposit with the bank from day to day such

funds as are actually needed to cover drafts which had just previously been presented. The real purpose of the draft arrangement is this maximum utilization of the insurance company's capital funds, rather than to insure receipt of a separate document of release, the continued use of which is little more than vestigial habit. Murray, "Drafts 'Payable Through' Banks" 77 Com.L.J., 389 (1972).

No good reason appears why it was unreasonable, much less bad faith, for Aetna to rely on Traders' endorsement as a guarantee of prior endorsements. Traders was the one best situated to verify the validity of the payee signatures. Traders chose to rely on the integrity of its depositor Lyons, and no one accuses it of bad faith in doing so. Similarly, Aetna has relied on the integrity of its endorser Traders, and it cannot justly be accused of bad faith for that reliance.

### C.

■ For its final argument on this phase of the case, Traders contends that it committed no breach of warranty of title, for the reason that Lyons had apparent authority to sign the draft on behalf of his client Porter. Aetna meets this argument first by challenge to the claim that Lyons is the one who endorsed Porter's name. This challenge need not be considered, for we are of the opinion that even if Lyons did sign Mrs. Porter's name, nevertheless that signature by him was completely without authority, even of the "apparent" variety.

■ The rule is that an attorney has no authority to settle a case for his client solely by virtue of the fact of his employment. Kahn v. Brunswick-Balke-Collender Co., 156 S.W.2d 40 (Mo.App.1941); Robinson v. DeWeese, 379 S.W.2d 831 (Mo. App.1964); 7 C.J.S. Attorney and Client § 105, p. 928. Nothing in the facts here takes this case out of that general rule. The wording of the contract between Lyons and Porter referring to the "amount collected" is obviously intended by the parties only as a basis upon which to measure the percentage contingent fee and cannot reasonably be construed as any authority to the attorney to make a settlement or actually collect money on behalf of the client. Moreover, Mrs. Porter's testimony makes it clear beyond question that she at no time gave any actual authority to Lyons to make any settlement or receive any money in her behalf. The trial court's finding in favor of Aetna constitutes an implied acceptance by the court of that testimony.

■ The entire claim by Traders that Lyons had authority to act for Porter reduces itself to a contention that Lyons could create apparent authority in himself by his own declaration to Traders that he had a right to bind her to a settlement and endorse her name to the draft. There is a double answer to this contention. In the first place, it was stipulated between the parties that Lyons "did not at any time exhibit or present to Traders any written authority from Marie Porter with reference to said draft No. M–10956408 or its presentment and negotiation." Further, the parties have stipulated that "Lyons did not at any time make to Traders Bank or its agents, servants or employees an oral statement that he possessed any authority from Marie Porter with reference to said draft No. M–10956408 or its presentment and negotiation." In the face of these stipulations, Traders has simply no basis to now claim that Lyons made representations sufficient to constitute apparent authority.

■ Equally to the point, any statements or declarations made by Lyons could not be effective to establish his own authority. Continental-St. Louis Corp. v. Ray Scharf Vending Co., 400 S.W.2d 467, 471 (Mo.App.1966); Jeff-Cole Quarries, Inc. v. Bell, 454 S.W.2d 5, 13 (Mo.1970). Restatement (Second) of Agency § 27, Comment C, cited by Traders, is not to the contrary. See Restatement (Second) of Agency § 284(d).

The opinion in McCully v. Kelley-Dempsey Co., 227 Mo.App. 775, 57 S.W.2d 784 (1933), does contain a statement that an attorney "has implied authority, upon receipt of a check therefor, to endorse said check for the purpose of collecting same * * * ." That statement must however be read in the context of the facts of that case which show that the client had in fact received and accepted from the attorney a portion of the collection which had been made by the attorney. This action by the client constituted a ratification of the collection and serves to distinguish the McCully case from the one at bar. Other cases cited by Traders have been fully considered and are even more readily distinguishable.

## II.

### Proximate Causation

 Under this heading, Traders argues that Aetna's loss flowed from Porter's failure to execute the separate release rather than from her failure to endorse the draft. This argument, like the closely related one advanced by Traders and considered under section I B of this opinion, ignores the fact that this draft itself would have constituted an effective release if it had been duly signed by Porter. This fact serves to completely distinguish Union Finance Co. v. National Bauk in North Kansas City, 463 S.W.2d 70 (Mo.App. 1970), and other similar cases relied upon by Traders.

## III.

### Interest Computation

 Both parties agree that the judgment was incorrect in awarding interest from April 30, 1968, which was a date prior to the time when the draft was even issued. Traders states a mild reservation as to whether any interest can be charged against it at all, but that effort to interject some doubt about any allowance of interest has no merit because of the provisions of § 400.4–207(3). The real difference between the parties on the question of interest has to do with the correct date from which interest should be computed to run.

Aetna claims that the date when interest should commence is August 12, 1968, when it paid the amount of the draft. Traders, on the other hand, contends that interest can begin to run against it only after demand, and it says that the only evidence of any demand is the filing of suit which occurred on April 30, 1970; and it claims that interest cannot begin to run until that date.

Fairness calls for interest to begin only after Traders was notified that it owed some money and after it had opportunity to comply with that legal obligation. The evidence shows that a demand was made and it was given opportunity to comply with its obligation on August 25, 1969. Interest as a matter of fairness and equity should begin to run from that date. While this question is not expressly covered by the Uniform Commercial Code, the result indicated is consistent at least by analogy with the provisions of § 400.3–122(3 and 4(b)). [1]

The judgment is modified under the authority of Rule 84.14 to provide interest from August 25, 1969, instead of from April 30, 1968. As so modified, the judgment is affirmed.

All concur.

---

1. Section 400.3–122 provides:
 "(3) A cause of action against * * * an indorser of any instrument accrues upon demand following dishonor of the instrument. Notice of dishonor is a demand.

 "(4) Unless an instrument provides otherwise, interest runs at the rate provided by law for a judgment * * *
 (b) in all other cases from the date of accrual of the cause of action."